**United States Court of Appeals
Fifth Circuit**

**F I L E D**

**December 21, 2005**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 26, 2006

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-10346

PAMELA RICHARDSON

Plaintiff - Appellant

versus

MONITRONICS INTERNATIONAL, INC.

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, DAVIS and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Pamela Richardson sued Defendant-Appellee Monitronics International, Inc. ("Monitronics"), alleging that she was fired in retaliation for exercising her rights under the Family and Medical Leave Act ("FMLA").[1] The parties consented to a trial before a magistrate judge, who eventually granted Monitronics's motion for summary judgment and dismissed Richardson's action. We affirm.

---

[1] 29 U.S.C. § 2601 et seq.

# I. FACTS AND PROCEEDINGS

## A. Background

From July of 2000 until October of 2002, Richardson worked in the customer service department of Monitronics, a monitoring company for residential and commercial alarm systems. This is the second FMLA suit that Richardson has filed against Monitronics.

### 1. The First Suit

In January 2001, Richardson's physician diagnosed her as suffering from carpal tunnel syndrome. She applied for FMLA leave, but Monitronics denied her request because she had not yet worked for Monitronics for one year, which is necessary for an employee to be entitled to FMLA leave. Consequently, Richardson took a two-month paid leave under Monitronics's occupational injury program. In addition to her two-month leave under that program, Richardson accumulated 12 absences and 22 tardies during the first four months of 2002. As a result of her attendance record, Monitronics suspended Richardson and issued her a warning for her attendance problems.

In April 2002, Richardson successfully applied for and was granted FMLA leave. During her absence, Monitronics implemented a new software program. When Richardson returned from leave, Monitronics restored her to the same job title, rate of pay, and position that she had when she took leave. Monitronics, however, prohibited Richardson from working overtime on weekends until she

was trained on the new software program. Once Richardson completed the training, Monitronics permitted her to work overtime.

In September 2002, Richardson sued Monitronics for violating her rights under the FMLA. Specifically, Richardson alleged that (1) Monitronics unlawfully denied her FMLA leave from January to March 2002 and unlawfully disciplined her for absences incurred during that period, and (2) Monitronics restricted her ability to work overtime in retaliation for taking FMLA leave. The district court found no violation of Richardson's FMLA rights, and we affirmed.

## 2. Chronological Background Underlying the Present Suit

### a. April 2003: Oral Warning

Richardson continued to have attendance problems in addition to those at issue in her first lawsuit. In April 2003 alone, Richardson incurred four absences and five tardies. As a result, her supervisor, Demekia Green, issued Richardson an oral warning.

### b. The New Monitronics Time and Attendance Policy

In May 2003, Monitronics instituted a new employee-attendance policy embodying a rolling 180-day period to evaluate employee attendance. Under this policy, one absence or two tardies constitutes an "occurrence." The policy specifies that arriving late, leaving early, exceeding a scheduled break, and violating the dress code count as "tardies." If, in any 180-day period, an employee incurs an "occurrence," Monitronics issues an oral

3

warning; two "occurrences" result in a written warning; three "occurrences" warrant a final warning; and four "occurrences" are cause for termination. The policy expressly states that employees may not leave work early without a supervisor's approval, and that employees must request supervisory approval to be absent from work at least 48 hours in advance. FMLA leave is not considered an occurrence for the purposes of the attendance policy.

### c. May 2003: Written Warning

Early in May 2003, Richardson incurred four "tardies" — May 2 (leaving early), May 7 (leaving early), May 7 (exceeding her scheduled break), and May 8 (away from her desk for an unacceptable period of time). This earned her two "occurrences" under the policy. Green issued a written warning to Richardson.

### d. Richardson's Request for FMLA Leave

On May 28, 2003, Richardson completed paperwork requesting intermittent FMLA leave because of her carpal tunnel syndrome. She did not, however, specify the dates on which she would need leave. Monitronics's Human Resources manager, Regina Sconyers, nevertheless approved Richardson's request.

### e. Summer 2003: Final Warning

From the end of May 2003 to August 2003, Richardson was tardy five times: May 28, June 2, June 5, June 23, and August 20. She contested the May 28, June 2, and June 23 tardies as pre-approved by her "lead," Dora Duran. Richardson provided documentation —

4

Duran's calendar for June —— that her June 23 tardy was pre-approved. As the calendar shows that "Pam left per F.M.L.A.," Monitronics removed that tardy from her record. The calendar did not include the same notation for the other disputed date in June, however, and Richardson presented nothing else to substantiate her claim that Duran had approved the other disputed tardies. Accordingly, Monitronics did not remove those tardies from Richardson's attendance record. In the end, Richardson's record reflected that she was tardy four times. Richardson thus accrued two more "occurrences" over the summer, bringing her total number of "occurrences" under the policy to four. Green issued Richardson a final warning, which stated that a repeat violation would result in immediate termination.

### f. October 2003: Termination

On October 21, 2003, Richardson incurred her final infraction. That day, Monitronics sponsored a self-defense workshop. The details on the informational flyer recommended loose-fitting clothing for the workshop, so Richardson wore a polo shirt to the session. She returned to her shift after the workshop without changing her clothes. As polo shirts are expressly prohibited under the Monitronics dress code, Richardson was sent home. By this time, Richardson had accrued four and a half "occurrences." Monitronics suspended Richardson for three days to determine the appropriate course of action with regard to her continued

5

employment with the company.  When Richardson's suspension ended, Monitronics fired her.

### 3.    The Present Lawsuit

After her termination, Richardson sued Monitronics alleging that she was fired in retaliation for her first FMLA lawsuit. Monitronics filed a motion for summary judgment to have the suit dismissed, assuming for the sake of argument that Richardson had established a prima facie case of retaliation under the FMLA, and the court, employing the traditional McDonnell-Douglas burden-shifting framework, granted Monitronics's motion on the ground that Richardson failed to present sufficient evidence to rebut Monitronics's assertion that it fired her for attendance policy violations.  On appeal, Richardson contends that the district court should have applied the "modified" McDonnell-Douglas framework —— otherwise known as the "mixed-motive" framework —— to her case. She argues that, even though retaliation was not the sole reason for her termination, it was a motivating factor in it.  Richardson further contends that, under the mixed-motive framework, Monitronics is not entitled to summary judgment. We have appellate jurisdiction under 28 U.S.C. § 1291.

## II.  ANALYSIS

### A.    Standard of Review

We review the district court's grant of summary judgment in

favor of Monitronics <u>de novo</u>.[2]  We will affirm the district court if there is no genuine issue of material fact, and Monitronics is entitled to summary judgment as a matter of law.[3]  We consider the evidence in a light most favorable to Richardson, the non-movant, but she must point to evidence showing that there is a genuine fact issue for trial.[4]

**B.   The FMLA**

The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise or the attempt to exercise, any right provided under" the act.[5]  Concomitantly, the FMLA prohibits employers from "discharg[ing] or in any other manner discriminat[ing[ against an individual for opposing any practice made unlawful" by the act.[6]  To make a <u>prima</u> <u>facie</u> case of retaliatory discharge, the employee must show that (1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge.[7]

---

[2]<u>Salge v. Edna Indep. Sch. Dist.</u>, 411 F.3d 178, 184 (5th Cir. 2005).

[3]<u>Id.</u>

[4]<u>Id.</u>

[5]29 U.S.C. § 2615 (a)(1).

[6]<u>Id.</u> § 2615(a)(2).

[7]<u>Hunt v. Rapides Healthcare Sys., Inc.</u>, 277 F.3d 757, 768 (5th Cir. 2001).

7

When there is no direct evidence of discriminatory intent, we have typically relied on the familiar McDonnell-Douglas burden shifting framework to determine whether an employer discharged an employee in retaliation for participating in FMLA-protected activities.[8] Specifically, once the employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.[9] If the employer succeeds in doing so, the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination.[10] Here, the district court granted Monitronics's motion for summary judgment under the traditional McDonnell-Douglas framework, concluding that Richardson failed to prove, by a preponderance of the evidence, that Monitronics fired her in retaliation for exercising her FMLA rights.

The traditional McDonnell-Douglas framework does not always apply in FMLA retaliatory discharge cases, however. The mixed-motive framework applies to cases in which the employee concedes that discrimination was not the sole reason for her discharge, but argues that discrimination was a motivating factor in her termination. This rule is based on a recent Supreme Court case,

---

[8]Id.

[9]Id.

[10]Id.

<u>Desert Palace, Inc. v. Costa</u>,[11] and our recent opinion in <u>Rachid v. Jack in the Box, Inc.</u>,[12] both of which endorse the mixed-motive framework for actions arising under other anti-discrimination statutes. Within the mixed-motive framework, (1) the employee must make a <u>prima</u> <u>facie</u> case of discrimination; (2) the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or ⸺ and herein lies the modifying distinction ⸺ (b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination.[13]  If the employee proves that discrimination was <u>a</u> motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus.[14]  The employer's final burden "is effectively that of proving an affirmative defense."[15]

In <u>Desert Palace</u>, the Supreme Court addressed specific evidentiary burdens under Title VII.  Title VII expressly prohibits

---

[11]539 U.S. 90 (2003).

[12]376 F.3d 305 (5th Cir. 2004).

[13]<u>Id.</u> at 312.

[14]<u>Id.</u>

[15]<u>Machinchick v. PB Power, Inc.</u>, 398 F.3d 345, 355 (5th Cir. 2005).

adverse employment actions that are motivated in part by discrimination on the basis of sex, race, color, religion, or national origin. Thus, Title VII explicitly permits actions proceeding under a mixed-motive framework.[16] At the time of <u>Desert Palace</u>, the courts of appeals were split as to whether (1) a plaintiff must adduce direct evidence of discrimination to have a court or jury review claims under a mixed-motive analytical framework, or (2) a plaintiff who presents only circumstantial evidence of discrimination is entitled to proceed under a mixed-motive framework.[17]

In ultimately deciding that a Title VII plaintiff does not face a heightened evidentiary burden in mixed-motive cases, the Court started with the text of Title VII. Specifically, the Court noted that Title VII (1) explicitly permits mixed-motive cases, (2) prohibits discrimination "<u>because of</u>" sex, race, color, religion, or national origin, and (3) "[o]n its face... does not mention, much less require, that a plaintiff make a heightened showing through direct evidence."[18] In addition, noted the Court, the statute's "silence with respect to the type of evidence required in mixed-motive cases also suggests that we should not depart from the '[c]onventional rule of civil litigation [that] generally appl[ies]

_____

[16]42 U.S.C. § 2000e-2(m).

[17]539 U.S. at 92-94.

[18]<u>Id.</u> at 98 (emphasis in original).

10

in Title VII cases.'"[19] Accordingly, a plaintiff in a Title VII action need only provide circumstantial evidence of discrimination to be entitled to proceed under the mixed-motive framework.

In Rachid, we extended Desert Palace and its ruling on the mixed-motive framework to the ADEA. Specifically, we held that (1) the mixed-motive analytical framework applies to ADEA cases, and (2) the plaintiff in an age discrimination action need not provide direct evidence of discriminatory intent to proceed under the mixed-motive analytical framework.[20] Rachid emphasizes that, like Title VII, the plain language of the ADEA prohibits discrimination "because of" age.[21] Moreover, "the ADEA neither countenances nor prohibits the mixed-motives analysis."[22] We recognized in Rachid that, unlike Title VII, the text of ADEA does not specifically provide for mixed-motive cases, but found such explicit statutory text unnecessary to the applicability of the mixed-motive framework in light of the foregoing reasoning.[23]

Rachid is the law of this circuit, and, even though it

---

[19]Id. at 99.

[20]376 F.3d at 310-12.

[21]Id. at 310-11.

[22]Id. at 311 n.8.

[23]Id. (explicitly rejecting Fourth Circuit dicta in Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 n.2 (4th Cir. 2004), indicating that it would find that there is no mixed-motive option when the statutory language does not explicitly permit it).

addresses a different anti-discrimination statute, consistency requires that we endorse the mixed-motive framework in appropriate FMLA retaliation cases.[24] First, the text of the FMLA prohibits discrimination because of the exercise of FMLA rights. Although the text of the statute does not contain the words "because of" when describing the discrimination that it proscribes, the text undeniably has that meaning. We have recognized this in fashioning the third element of an FMLA plaintiff's prima facie case, i.e., that there must be a causal link between the protected activity and the adverse employment action. In addition, the FMLA —— like the ADEA —— neither countenances nor prohibits the mixed-motive analysis. Thus, the mixed-motive framework is not at odds with the statutory text.

Furthermore, even though the text of the FMLA does not explicitly authorize the use of the mixed-motive framework, the regulations promulgated under it clearly anticipate mixed-motive cases. The regulations state that an employer may not discriminate against an employee who has taken FMLA leave, specifying by example that "employers cannot use the taking of FMLA leave as a negative factor in employment actions."[25] The regulations confirm that the FMLA protects employees from having their exercise of FMLA rights

_____

[24]See Oby v. Baton Rouge Marriot, 329 F.Supp.2d 772, 786 (M.D. La. 2004) (relying on Rachid to apply a mixed-motive analysis to an FMLA claim).

[25]29 C.F.R. § 825.220(c) (emphasis added).

12

considered as "a" factor in the decision-making process. Accordingly, there is a textual basis, albeit regulatory, for applying a mixed-motive analysis.

Based on the foregoing, we are convinced that the district court erred in evaluating Richardson's FMLA retaliation claim under the traditional McDonnell-Douglas framework. Richardson is entitled to have her claim reviewed under a mixed-motive analytical framework. Today's holding accords with the opinion of the only other federal appellate court that has specifically addressed the applicability of the mixed-motive framework to the FMLA.[26]

## C.   Application to Richardson's Case

### 1.   Richardson's Prima Facie Case and Monitronics's Legitimate, Nondiscriminatory Reason

In its brief, Monitronics appears to contest Richardson's ability to establish a prima facie case. As we noted, however, Monitronics's motion for summary judgment assumes for the sake of argument that Richardson did establish a prima facie case of discrimination. Accordingly, Monitronics has waived any argument on appeal that Richardson cannot establish a prima facie case of discrimination. Montironics has, however, articulated a legitimate, nondiscriminatory reason for firing Richardson: She acquired 4.5 occurrences under the attendance policy, which calls

---

[26]Gibson v. City of Louisville, 336 F.3d 511, 513 (6th Cir. 2003) (acknowledging that an FMLA plaintiff does "not need to prove that discrimination was the sole reason for his termination").

13

for termination, and she had a lengthy history of attendance problems.

## 2. Discrimination as a Motivating Factor in Richardson's Discharge

Richardson has presented sufficient evidence to create an issue of fact as to whether the exercise of her FMLA rights was a motivating factor in her discharge. Specifically, Richardson testified that, about a month before she was fired, she overheard her manager, Reginald Blakely, tell Green that "We'll just fire her ass. We'll worry about it later." Richardson confronted Blakeley about the statement, and he responded that he was "tired of all of this stuff" going on with her. Monitronics does not deny the statements. Although the statements could relate to Richardson's attendance policy violations, they could also relate to her FMLA leaves or to her ongoing suit against Monitronics, or both. Similarly, Richardson testified that the head of Human Resources informed her that Monitronics would no longer accommodate her, that it had "accommodated her enough." Monitronics disputes the statement, but, taken in the light most favorable to Richardson, the statement could be probative of a hostile environment. The hostile remarks and the temporal proximity of Blakely's remarks to Richardson's termination, taken as a whole, raise an issue of fact as to whether retaliation was a motivating factor in Richardson's

14

termination.[27]

Richardson insists that there is other evidence that creates an issue of fact as to whether retaliatory animus was a motivating factor in her termination. Her proffered evidence falls short of the mark. For example, Richardson protests that she was disciplined for three tardies that had been approved by her "lead," Duran. Therefore, complains Richardson, Monitronics should not have disciplined her for those tardies under the attendance policy. Richardson offers nothing else, however, such as testimony from Duran, to support her assertion. Notably, the only documentary evidence before us, Duran's calendar, indicates that she did not approve at least one of the contested tardies.

Richardson also asserts that Monitronics manufactured the dress code violation that lead to her termination. She admits, however, that she was in violation of the dress code. There is nothing before us to suggest that the Monitronics dress code did not remain in full effect while employees were at the office. Accordingly, Richardson's contention that her dress code violation was a suspect reason for terminating her fails to indicate retaliatory animus.

Richardson further contends that Monitronics departed from its own progressive discipline attendance policy when it terminated her

---

[27]Cf. Machinchick v. PB Power, Inc., 398 F.3d 345, 355 (5th Cir. 2005) (considering plaintiff's evidence as a whole to determine whether discrimination was a motivating factor in adverse employment decision).

15

when it failed to give her an oral warning after the policy went into effect in May 2003. Richardson's argument is merely semantic. She received an oral warning in April 2003 for incurring four absences and five tardies —— more than 6 occurrences ——  in that month alone.  Shortly after her oral warning, Richardson received (1) a written warning in May 2003, (2) a final warning in August 2003, and (3) termination in October 2003.  An employer's failure to follow its own policies may be probative of discriminatory intent, but it would be too far a stretch to infer discriminatory intent on these facts.  Richardson can twist the facts to argue that the progressive discipline she received departed from the attendance policy, yet this "departure" is not probative of retaliatory animus.

Finally, Richardson insists that Monitronics made several changes to her schedule without giving her proper notice in an effort to induce her to commit attendance policy violations. Significantly, however, Richardson's deposition testimony reveals that Monitronics changed her schedule only <u>once</u> without proper notice, and that management recognized its error and apologized to her.  Richardson did <u>not</u> testify that the improperly-noticed schedule change induced her to violate the attendance policy.

## 3. Monitronics Would Have Fired Richardson Absent any Retaliatory Animus

Richardson submitted sufficient evidence to create a fact issue whether retaliatory animus was <u>a</u> motivating factor in

16

Monitronics's decision to fire her. Monitronics was thus required to provide sufficient evidence to establish as a matter of law that it would have fired her despite any retaliatory motive; and Monitronics met this burden. Most significantly, the attendance policy undeniably specifies that four occurrences result in termination. Richardson acquired more than enough occurrences to justify her termination under the policy. Moreover, Monitronics demonstrated that it has <u>always</u> maintained a company policy that attendance is a key consideration in determining whether an employee is entitled to continued employment; and Richardson has a long history of attendance problems. The foregoing evidence overcomes Richardson's evidence of retaliatory motive which consists entirely of ambiguous or conclusional statements. We are convinced that the <u>only</u> reasonable conclusion a jury could make is that Monitronics would have fired Richardson with or without retaliatory animus. Monitronics thus carried its burden of proving that it would have fired Richardson irrespective of any retaliatory motive.

### III. CONCLUSION

Even under the mixed-motive framework that we today hold to be applicable in FMLA retaliation claims, Monitronics has carried its burden of proving that it would have fired Richardson despite any retaliatory motive. Monitronics is therefore entitled to a summary judgment dismissing Richardson's action. We affirm the judgment of

17

the district court, albeit for the foregoing, different reasons.

AFFIRMED.