# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 26, 2013

Lyle W. Cayce
Clerk

No. 12-60682

TODD W. ION,

Plaintiff – Appellant,

v.

CHEVRON USA, INCORPORATED,

Defendant – Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

Before ELROD and HIGGINSON, Circuit Judges, and MARTINEZ,[1] District Judge.

PHILIP R. MARTINEZ, District Judge:

Appellant Todd W. Ion, a former employee of Appellee Chevron USA, Inc., appeals the district court's grant of summary judgment in favor of Chevron. Ion alleges that Chevron terminated him in retaliation for exercising his rights under the Family Medical Leave Act ("FMLA"). The district court held that, while Ion had established the existence of a genuine dispute as to a material fact regarding Chevron's motivation, Chevron had established as a matter of law that it would have terminated Ion despite any retaliatory motive. We disagree and, therefore, **REVERSE** the district court's grant of summary judgment to

---

[1] District Judge of the Western District of Texas, sitting by designation.

1

No. 12-60682

Appellees and **REMAND** for further proceedings consistent with this opinion.

## I. Facts and Proceedings

### A. Background

Todd Ion began work at Chevron's Pascagoula Refinery in November 2006. As one of Chevron's three laboratory chemists, Ion's duties included, among other things, maintaining an assigned set of laboratory instruments. From 2008 to 2009, Ion's supervisors were Steve Ogborn, chief chemist; Vince Dressler, lead chemist; and Rich Kerns, laboratory supervisor.

In November 2008, Ion and his wife separated, and his wife moved to Kentucky with their five-year-old son. Ion reports having told Dressler about the separation and informing him that he would be traveling to Kentucky on weekends to visit his son.[2]

### B. Possible FMLA Leave

In late 2008, Ion learned of Chevron's leave policies for "employee[s] going through 'a life-changing event' like a divorce." Ion was "hesitant" to ask for leave because it was a busy time at the chemistry lab, which had an audit scheduled for March 2009. He was also hesitant because he knew that another chemist, Pam Miller, would be taking maternity leave in August of 2009. Nevertheless, he alleges that he discussed his interest in potential leave with Dressler, including asking for advice about broaching the subject with Ogborn, who "could be difficult and had to be approached delicately."

---

[2] Ion submitted a declaration indicating that the facts section of his response to the motion for summary judgment was, with some exceptions, "based on [his] personal knowledge." He "declare[d] under penalty of perjury that [these] statements are true and correct." Although unsworn documents usually cannot raise fact issues precluding summary judgment, Ion's declaration can be considered pursuant to the statutory exception found in 28 U.S.C. § 1746. 28 U.S.C. § 1746(2) (2006) (permitting unsworn declarations to substitute for an affiant's oath if the statements contained therein are made "under penalty of perjury" and verified as "true and correct."); *see Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306–07 (5th Cir. 1988).

2

No. 12-60682

Ion testified that the chemistry lab held an all-day planning meeting on February 5, 2009. During a break, he claims that he told Ogborn that he had been granted custody of his son for six months. Ion further alleges having informed Ogborn that he had moved into a rental home much closer to the plant; that he had enrolled his son in a daycare close to the plant; that his son was crying, refusing to eat, and not adjusting well; and that he would be spending time with his son during lunchtime to help him adjust. Ion asked to meet with Ogborn on February 9 to discuss taking a leave from work, and, according to Ion, Ogborn agreed to meet. Additionally, Ion asked Ogborn for permission to leave the February 5 meeting to join his son for lunch, and Ion reports that Ogborn "readily gave [him] permission." Ion left the meeting and returned while it was still in progress, which he asserts that "[e]verybody in the department saw."

Ogborn, on the other hand, testified that he has no memory of a conversation with Ion on February 5, 2009. He also testified that he has no memory of Ion ever expressing an interest in taking leave.

According to Ion, Ogborn cancelled the February 9 meeting to discuss leave because he was too busy. Over the next two or three weeks, Ion says, Ogborn "cancelled another two meetings to discuss [his] request." Finally, Ogborn allegedly told Ion that they would have to wait to discuss the possible leave until after the audit, which would end March 13, 2009.

**C. Suspension**

On March 16, 2009, Ion's supervisors met with him to inform him that he was being suspended for a five-day period. The supervisors explained to Ion that two major concerns had led them to suspend him temporarily—performance deficiencies and the excessive length of his lunch breaks—and they presented Ion with a "Performance Agreement and Attendance Improvement Plan" ("PIP/AIP") meant to "address [his] performance deficiencies," "specifically issues

3

relating to work times and accountability."

According to Ion's PIP/AIP, his alleged performance deficiencies consisted of the following: "[l]ack of urgency/responsiveness concerning [his] assigned instruments," "not taking full responsibility and ownership of assigned instruments," routine lack of availability "to come on-site to repair," missed deadlines and incomplete work, and "lack of communication to . . . customers" that impeded the efficient running of the laboratory. Ion's PIP/AIP states that these performance deficiencies were initially discussed with Ion at his December 2008 pre-review meeting and again at Ion's in-person performance review in January 2009. While Ion admits having discussed these concerns with his supervisors at the December 2008 meeting, he testified that he was "absolutely certain" that no negative items were discussed during his January 2009 performance review.[3] He further claims that the list of deficiencies in his written performance evaluation, which was issued after his in-person performance review in January 2009,[4] was not written at the time of his January review. He also testified that his performance rating for 2008 was never discussed with him, although it is listed on the performance evaluation.[5]

---

[3] Indeed, Ion reports that, during his January 2009 performance review, Ogborn "acknowledged that [Dressler] had told him about [Ion's] separation and family difficulties" and "said it must be like a death in the family." Ogborn, on the other hand, testified that while he knew "that [Ion was] having some marital problems," "[t]hat [was] all [he] knew." Ion maintains that he thanked Ogborn for his understanding and requested a separate meeting to discuss the possibility of leave, to which "Ogborn was receptive."

[4] It is unclear from the record when Ion's written performance evaluation was completed. Although Ion's in-person performance review was held at the end of January 2009, Ion testified that he never received a final copy of his evaluation, since "[he] was not . . . there [at Chevron] long enough to get it." Additionally, although the evaluation includes a section to be signed by both the employer and employee, Ion's evaluation is neither signed nor dated.

[5] Ion received a 2- performance rating for 2008. Although a 2- is the lowest score in the "Meets Performance Expectations" range of Chevron's 1-to-3 employee performance scale, Ogborn

No. 12-60682

In addition to the alleged performance deficiencies, Ion's PIP/AIP lists "a pattern of abuse" regarding attendance as another reason for Ion's suspension. Ogborn and Dressler had first met with Ion about the length of his lunch breaks on March 11, 2009. Ogborn testified that he and Dressler noticed Ion's absences when they were unable, on several occasions, to contact him during the lunch hour. After reviewing Chevron's security-gate records, Ogborn concluded that Ion was "taking excessive periods of time for lunch." At the March 11 meeting, according to Ion, Ogborn accused him of "stealing from the company" and told him that the breaks constituted being absent without leave, a "very serious violation of Chevron's policies."

Ion admitted in his deposition that he had been taking more than thirty minutes for lunch. He testified that he was "not sure if [he] ever saw anything that said that [the requirement] was 30-minute lunches" for exempt salaried employees and that "[r]outinely," "[e]verybody" took longer than thirty minutes. He also claims that he "regularly told Vince Dressler that he was off to the daycare" at lunchtime, and Dressler "never objected." On March 12, Ion brought Ogborn the sign-in sheets from his son's daycare to substantiate his claims about where he was during his lunch breaks. Ogborn testified, "There were some days in which the log records matched up with the absences listed on the calendars. There were multi [sic] days in which they did not." Although he reported having remaining questions about what Ion did during his lunch breaks, Ogborn did not investigate further.

Ion's PIP/AIP, issued on March 16, initiated a five-day suspension from March 16 through March 20, 2009. It concluded by warning Ion that "[f]ailure to comply with agreements will result in further disciplinary action up to and including termination" and that "if significant and **sustainable** progress is not

characterized it as a "deficiency" in his deposition.

No. 12-60682

shown during this PIP or if a violation of . . . Company policies occurs, the most likely outcome will be termination."

Ion reports that he received the PIP/AIP and added his signature to indicate "that [he] received it," although he told Ogborn that he did not agree with its contents. According to Ion, Ogborn told him there would be no discussion of leave while he was suspended. When Ion replied that he still wanted information about leave, Ogborn "got loud and hostile" and told Ion that he would have to ask the Employee Assistance Program ("EAP") for help, since Ion would "not get it from [him]." Ion left the meeting.[6]

**D. Initiating Leave**

On March 19, Ion contacted Tina Taylor, an EAP counselor at Chevron. Ion claims that Taylor told him they could "pull [him] from the workplace and send [him] to a license[d] professional counselor for evaluation." Taylor added, "Your situation is exactly what this program is for. We've got a program for you. FMLA leave might be available." Taylor then scheduled an appointment for Ion with Dr. Ronald Berman, a licensed professional counselor in Mobile, Alabama. Ion reports that Taylor assured him that the sessions would be confidential and that he did not "have to sign a general medical release." According to Ion, she also told him "to call in sick every day, and she would start the paperwork."

Ion met with Dr. Berman "on March 19 or 20, 2009." On March 23, the day Ion was scheduled to return to work, Dr. Berman signed FMLA form 380, "Certification of Health Care Provider," certifying that Ion was suffering from

---

[6] Ion's eventual termination letter noted that, after leaving the meeting to collect his personal items, Ion also took "Chevron company equipment (laptop, blackberry, Chevron credit cards, etc.)" home with him. In her deposition, HR Business Partner Johnette Watson clarified that this was included to ensure that Chevron "got those items back." She also said that it was "strange" for Ion to have taken that equipment, although Ogborn had previously suggested to Ion that he take his computer home to make up for his unavailability on weekends.

6

No. 12-60682

a serious health condition as defined by the FMLA. According to the form, Ion was incapacitated and unable to perform work of any kind. Berman listed the medical facts supporting certification as "too much stress—can't focus on his job—single parent." He reported the anticipated end date of the incapacitation as "undetermined." He also indicated that Ion would need "therapy and eval[uation] for medication" and that Ion required an estimated twenty "additional treatments." The form was faxed to Chevron on March 23 at 4:03 p.m., although it was not stamped "received" by Chevron until March 24.

On March 23, Ion called Ogborn to report that he was sick and under the care of an EAP counselor. Ogborn told Ion to report the absence to Chevron's nurses' station. In a "note to file" written on the 23rd, Ogborn wrote that "[Ion] called in sick at 6:09 am this morning" and thus did not attend a meeting to discuss the PIP/AIP with Ogborn, Dressler, Kerns, and HR Business Partner Johnette Watson.[7] Ion alleged that he called in sick in accordance with Taylor's instructions that he should "call in sick every day until all this goes through."

On March 24, Ion again called in sick. He also informed Ogborn that he was working on paperwork for some kind of short-term disability, as Ogborn's "note to file" from that day confirms. Ogborn again asked him to report the absence to the nurses' station. Ogborn also called Watson, who recommended sending an e-mail to the clinic asking them to keep him informed "as to when [Ion] will be back to work."

Ogborn followed Watson's recommendation and e-mailed the clinic, asking them to "keep [him] informed as to [Ion's] status and when [he could] expect [Ion] back." He copied Watson and Chris Melcher, the refinery's General

---

[7] The record does not address when this meeting was originally scheduled, nor does it indicate whether Ion was made aware of it.

7

No. 12-60682

Manager,[8] on the e-mail. Melcher responded:

> It looks like Mr. Ion is playing games with us after his suspension. I assume the "paperwork for short-term disability" comment means that he is looking for a doctor to give him some FMLA-qualified time off. What are our options moving forward?

### E. Clinic Incident

On the same day, March 24, Chevron nurse Angela Fortney sent an e-mail to Ion informing him that his "FMLA paperwork ha[d] been sent to [him] in the mail." She continued, "[Y]ou need to report to the clinic ASAP to complete a GO-153 form." A GO-153 form is entitled "Authorization for Release of Medical and Other Information" and requires the contact information of the employee's health care provider. Watson testified that the form is necessary to "certify the FMLA" so that the company can "talk to the physician to make sure that the illness qualifies as an FMLA."

Ion went to the clinic the next day, March 25, after another nurse asked him to come in and "sign some paperwork for disability." According to Ion, once he arrived at the clinic, one of the nurses requested that he sign the GO-153 form. The nurse informed him that the form was "a medical release that would allow Chevron to get copies of his medical records." Ion told the nurse that Tina Taylor, an EAP counselor, had assured him he would not have to sign a release. He reports that the nurse responded that "she was not allowed to answer any questions or give him any information," and "[s]he insisted that [he] had to sign the form." Ion asserts that he asked two other nurses about the same matter;

---

[8] We refer to Melcher as the refinery's "General Manager" pursuant to Ion's description of Melcher's position. However, Melcher's exact job title is unclear. The record indicates that he was Watson's "immediate boss," and Ogborn refers to needing Melcher's "permission" to go forward with Ion's suspension.

No. 12-60682

both told him "they could not answer any questions." Instead, they referred him to Angela Fortney, who was not available.

Ion reports becoming "extremely frustrated because [the nurses] were asking him to sign a form that they weren't explaining." After a nurse told him to ask Human Resources, he called Johnette Watson. When he asked for information explaining the GO-153 form, Watson gave him various policy numbers to request from Ogborn. Ion requested and reviewed the policies, but he alleges that "none explained the form." He again contacted Watson, who gave him two additional policy numbers. Ion reviewed these policies as well but found no mention of GO-153 forms. Ion then returned to the clinic "looking for Ms. Taylor," the EAP counselor. Another nurse took him to Taylor's office, but Taylor was not there. He did, however, see Fortney and informed her that "he needed to ask . . . some questions about the difference in short-term disability, long-term and FMLA." Ion reports that Fortney "exploded. She stood up and in a loud voice demanded that Ion get out and leave the clinic." Ion recalls feeling "speechless, shocked and humiliated." He left the refinery without signing the form. The next day, March 26, Ion reports receiving a call from Alice Brown, who told him that Chevron had assigned her to be his Case Manager for his FMLA leave. Ion alleges that "[s]he apologized for the nurses having called him into the clinic" and "said that should not have happened."

In his "note to file" about the incident, dated March 25, Ogborn wrote:

> [Ion] refused to sign the [GO-153] form stating that the
> EAP Rep . . . said that he didn't need to sign the form.
> [Ion] asked the Clinic personnel many HR questions
> regarding policies and pay of which they didn't know
> the answers to and repeatedly referred him to HR. . . .
> He was asked to leave but tried to circumvent leaving
> by getting another clinic employee . . . to take him to
> [Taylor's] office even after he was told that [Taylor]

9

No. 12-60682

wasn't in today.

The clinic employees told Ogborn that  Ion had made them feel uncomfortable. They described his demeanor to Ogborn as "passive/aggressive harassment," "disgruntled," and "angry" and reported that Ion told the nurses he "didn't trust them."

Ogborn testified that this incident was serious enough to call security "for a potential workplace violence situation."  Watson testified that, although she "[could not] recall" believing that Ion posed any threat, "[s]ecurity had some reservations" about Ion.  Revere Christophe, a security officer at the refinery, testified that he conducted a "threat assessment" regarding Ion after the clinic incident on March 25.[9]  In this assessment, he determined that Ion was "belligerent and abusive toward the nursing staff."  Because this behavior "[g]ave rise to concerns of workplace violence," Christophe banned Ion from entering Chevron's property.

### F. Conversation with James Peel

The same day as the clinic incident, March 25, James Peel, Ion's office mate, approached Dressler about statements that Ion had made to him on March 12, 2009.  In a follow-up e-mail to Ogborn, Peel claimed that Ion had come back from meeting with Ogborn and Dressler about his lunch hour absences "in an angered state of mind." "He openly shared with me his frustrations," Peel wrote. "He spoke of quitting his job.  Then he mentioned faking a nervous breakdown related to his divorce so he could take a leave of absence with FMLA and EAP benefits. He also boasted about how he could get paid for being at home."  Peel explained in his deposition that he had not told Ogborn or Dressler of the

---

[9] Chevron attached Christophe's affidavit to its "Reply in Support of Its Motion for Summary Judgment," filed February 3, 2012.  The affidavit was sworn to on February 2, 2012.

conversation earlier because he "feared that . . . something bad would happen and [Ion] would get fired or whatever." He changed his mind, however, because, as he testified, "I have a problem, a philosophical problem with doing somebody else's work when I know they're sitting at home sipping beers watching Oprah or The View or whatever." Peel also testified that Ion "sounded . . . like he . . . probably would" follow through with this plan.

**G. Termination**

On the same day, March 25, Ogborn forwarded Peel's e-mail to Chris Melcher and Johnette Watson along with the following comments:

> It is clear to me that [Ion] is doing exactly what he told [Peel] he was going to do. . . . I think strong action should be taken since [Ion] has premeditatedly plan[n]ed to fake an "illness" and bilk Chevron. We don't need this type of criminal behavior in Chevron.

Following this e-mail, Melcher, Watson, and Ogborn had a conversation about "[t]he fact that [Ion] had told Mr. Peel that he was going to fake an illness. And then, in fact, he had been out of work after his suspension." When asked what was discussed, Watson testified:

> The fact that Mr. Peel was alleging that [Ion] was going to fake an illness. And the fact that he hadn't been at work. And then also, I believe it was the same day that Mr. Peel came forward that all the issues happened in the clinic. And so it was kind of one thing after the other.

Watson testified that Melcher was the first to suggest termination.

The next day, March 26, Ion again called in sick. He told Ogborn that

11

No. 12-60682

"Alice Brown had the FMLA paperwork" and informed him that "he would be out of work [until] approximately April 27." Ogborn told him to let the clinic know.

Later that week, Melcher contacted Watson to let her know that they were terminating Ion. She drafted the termination letter, which was reviewed by Melcher, Ogborn, and an in-house attorney. Watson testified that the final letter was "an accurate statement of the reasons Mr. Ion was terminated." The letter, signed by Ogborn, was sent to Ion on April 2, 2009,[10] and reads as follows:

> The reason for the termination is an abuse of management constituting insubordination.
>
> On March 16, 2009, you were put on a Performance Improvement Plan, received a 5 day suspension and given a final warning for poor performance and behaviors, being absent without leave and falsification of time records. When you left our meeting to go to your office to collect some personal belongings, you also took Chevron company equipment (laptop, blackberry, Chevron credit cards, etc.), cleaned out all your personal belongings and indicated your anger to your office mate. On March 25th we learned you had previously stated to this same office mate that you would fake a nervous breakdown related to your personal situation so you could get paid for being at home. You haven't returned to work since your suspension.
>
> Based on your overall performance, the seriousness of the policy violations and your behavior following the March 16th discussion, Chevron management has decided to end your employment effective immediately.

The letter also informed Ion of his right to appeal the decision "through the refinery's Problem Resolution Process," which Ion did not exercise.

---

[10] Dr. Berman cleared Ion to return to work on May 18, 2009.

No. 12-60682

**H. Procedural History**

On March 29, 2011, Ion filed a complaint against Chevron with the District Court for the Southern District of Mississippi. In his Complaint, Ion alleged two violations of the FMLA: (1) that Chevron had terminated him in retaliation for taking FMLA leave, a violation of 29 U.S.C. § 2615(a)(2); and (2) that Chevron had "interfered with his right to take FMLA leave and to be reinstated upon his return," a violation of 29 U.S.C. § 2615(a)(1). On November 30, 2011, Chevron moved for summary judgment on Ion's retaliation claim. The district court granted the motion on April 11, 2012, holding that Chevron "ha[d] shown that it would have terminated Ion even if he had not applied for FMLA leave." Chevron then filed a second summary-judgment motion to address Ion's interference claim. The district court granted this motion as well, since the parties agreed that the court's ruling on the first summary-judgment motion compelled dismissal of Ion's interference claim. Ion appealed the district court's ruling on his retaliation claim. Because Ion addressed only the retaliation claim on appeal, he has waived his FMLA interference claim. *See United States v. Pompa*, 434 F.3d 800, 806 n.4 (5th Cir. 2005) (citing Fed. R. App. P. 28(a)(9)(A); *United Paperworkers Int'l Union AFL–CIO v. Champion Int'l Corp.*, 908 F.2d 15252, 1255 (5th Cir. 1990)) ("Any issue not raised in an appellant's opening brief is deemed waived.").

II.    **Standards of Review**

**A. Summary Judgment Standard**

We review a grant of summary judgment de novo, applying the same standard as the district court. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 635 (5th Cir. 2011) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004)). Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) (citations omitted). A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party. *Id.* (citing *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 2006)). Moreover, a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *Vaughn*, 665 F.3d at 635 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002)). In addition, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted).

**B. Family and Medical Leave Act and Mixed-Motive Framework**

The FMLA entitles employees to take reasonable leave for medical reasons. 29 U.S.C. § 2601(b)(2) (2006). Additionally, the act prohibits employers from discharging or in any other manner discriminating against an individual for opposing any practice made unlawful by the act. *Id.* § 2615(a)(2). The Department of Labor has interpreted this statutory provision to forbid employers from terminating employees for having exercised or attempted to exercise FMLA rights. 29 C.F.R. § 825.220(c).

We held in *Richardson v. Monitronics International, Inc.*, that the mixed-motive framework applies to FMLA claims in which retaliatory animus was a motivating factor in an adverse employment action. 434 F.3d 327, 333 (5th Cir.

14

2005). To escape liability under this framework, an employer must show that the retaliation was not the but-for cause of its action. *Id.*

The Supreme Court's recent decisions in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), have limited the applicability of the mixed-motive framework in cases involving Title VII and the Age Discrimination in Employment Act. In this case, neither party has sought additional briefing in light of *Nassar* or urged this court to revisit the applicability of the mixed-motive analysis. Because the district court addressed—and the parties briefed, argued, and do not now contest resolution of—this case under the mixed-motive rubric, we apply it here.[11] We emphasize that we need not, and do not, decide whether *Nassar*'s analytical approach applies to FMLA-retaliation claims and, if so, whether it requires a plaintiff to prove but-for causation. Based on the evidence addressed in sections III(C)–(D), we conclude that a genuine issue of material fact exists under either standard.

To survive summary judgment under the mixed-motive burden-shifting framework, an employee must first make a prima facie case of FMLA retaliation. *Richardson*, 434 F.3d at 333. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer carries this burden, the burden shifts once more to

---

[11] In *Gross*, the Court noted that, "[w]hen conducting statutory interpretation, [courts] 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" *Gross*, 557 U.S. at 174 (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)). The relevant provision of the FMLA uses the word "for" in lieu of the phrase "because of," the language contained in both the Title VII provision at issue in *Nassar*, *see* 42 U.S.C. § 2000e–3(a) (2006), and the ADEA provision at issue in *Gross*, *see* 29 U.S.C. § 623(a)(1) (2006). The Department of Labor has interpreted this provision to prohibit employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c) (2013). Whether these facts prove consequential is a question best left for another day.

the employee to offer sufficient evidence to create a genuine issue of fact that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination. *Id.* If an employee is successful in meeting the burden, an employer may still escape liability, and have summary judgment granted in its favor, by providing sufficient evidence to establish as a matter of law that it would have taken the adverse employment action despite its retaliatory motive. *Richardson*, 434 F.3d at 336. "The employer's final burden 'is effectively that of proving an affirmative defense.'" *Id.* at 333 (quoting *Machinchik v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).

## III.   Analysis

### A. Prima Facie Case

Under the first step of the mixed-motive burden-shifting framework, Ion must establish a prima facie case of FMLA retaliation.  To do so, Ion must show that (1) he was protected under the FMLA, (2) he suffered an adverse employment action, and (3) the adverse action was taken because he sought protection under the FMLA. *Maunder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (citation omitted).   Whether Ion established a prima facie case of FMLA retaliation is not in dispute on appeal. Both the district court, in its opinion, and Chevron, in its summary judgment motion, assumed that Ion established a prima facie case. Moreover, Chevron did not raise this issue on appeal.  Thus, we will proceed to the next step of the mixed-motive framework.

### B. Legitimate, Nondiscriminatory Reasons

The second step of the framework requires that Chevron articulate a legitimate, nondiscriminatory reason for Ion's termination.  The district court held that Chevron had met its burden by articulating the following nondiscriminatory reasons for termination: (1) Ion's unexcused absences from

work, (2) his poor performance, (3) his statements to Peel regarding faking a nervous breakdown, (4) his removal of Chevron property from his office, and (5) his behavior toward the clinic employees.  Whether Chevron met its burden under this step is also not in dispute on appeal.  Ion did not raise this issue in his appeal, so we will accept the district court's finding and next consider the third step of the mixed-motive framework.

## C. Motivating Factor

In the third step, Ion bears the burden of offering sufficient evidence to create a genuine issue of fact that Chevron's nondiscriminatory reasons, although true, are only some of the reasons for its conduct, another of which was discrimination.  In other words, Ion must offer evidence to show that the exercise of his FMLA rights was a motivating factor in his termination.  Ion offered the following evidence:  (1) the termination letter's mention of insubordination, (2) the termination letter's mention that he did not return to work after his suspension, and (3) the e-mail dated March 24, 2009, from General Manager Chris Melcher.

First, Ion argues that the termination letter's mention of his "insubordination" can only refer to his refusal to sign the GO-153 form.  Chevron denies Ion's contention but does not explain what conduct constituted "insubordination." When asked during his deposition whether "insubordination" included Ion's failure to sign the GO-153 form, Ogborn testified, "Not to my knowledge."  Yet, despite Chevron's lack of clarity, Ion does not offer any evidence to support his contention—he merely states the allegation.  After analyzing the termination letter, the district court concluded that "insubordination" did not include Ion's refusal to sign the GO-153 form.  Instead, the district court concluded that "insubordination" referred to the events listed in the letter.  The district court went on to hold that Ion's speculation about

what Chevron meant was insufficient to show that Chevron terminated him because of a retaliatory motive.

In determining whether the mention of "insubordination" in the termination letter qualifies as retaliatory evidence, we are mindful that we must interpret the facts and draw all reasonable inferences in favor of the nonmoving party, Ion. Even with this deference, however, we agree with the district court that Ion's allegation is unsupported and does not rise above speculation. Without more, we cannot draw Ion's requested inference in his favor, and his mere speculation is insufficient to create a fact issue regarding whether retaliation was a motivating factor. *Reyna v. Cross Seas Shipping Corp.*, No. 92-7440, 1993 WL 67129, at *2 n.7 (5th Cir. Mar. 4, 1993) (unpublished but persuasive) ("Mere speculation is insufficient to defeat a summary judgment motion . . . .").

Second, Ion argues that Ogborn's statement in the termination letter, "[y]ou haven't returned to work since your suspension," indicates that his FMLA-related absence was a reason for his termination. Chevron argues that this language is merely a factual statement, not a reason for Ion's termination. The district court held that "a reasonable jury could conclude that this mention of Ion's absence from work, in the litany of other complaints about his actions, showed that Chevron considered FMLA protected leave in terminating him." We agree with the district court. Drawing all reasonable inferences in favor of the nonmoving party, a reasonable jury could conclude that the inclusion of this statement in the same paragraph listing the reasons for Ion's termination could indicate that his absence was also a reason for his termination.

Third, Ion also argues that an e-mail sent by General Manager Chris Melcher to Ogborn, Alice Brown, and Johnette Watson on March 24, 2009, is evidence of Chevron's retaliatory motivation. The email states:

18

No. 12-60682

> It looks like Mr. Ion is playing games with us after his suspension. I assume the "paperwork for short-term disability" comment means that he is looking for a doctor to give him some FMLA-qualified time off. What are our options moving forward?

The district court did not discuss this piece of evidence in its opinion. Drawing all reasonable inferences in favor of Ion, this e-mail serves as evidence that General Manager Chris Melcher was upset that Ion was seeking FMLA-qualified time off. Further, a jury could reasonably conclude that Melcher was attempting to stop Ion from taking FMLA leave or punish him for taking FMLA leave. Therefore, this evidence is sufficient to create a genuine issue of fact as to whether Ion's FMLA-protected leave was a motivating factor in Chevron's decision to terminate him.

### D. Affirmative Defense

Finally, the burden again shifts to the employer to prove that it would have taken the same action despite its discriminatory animus. *Richardson*, 434 F.3d at 333. At the summary judgment stage, Chevron must provide sufficient evidence to establish as a matter of law that it *would* have fired Ion despite his FMLA-related absence. *Id.* at 336. This final burden "is effectively that of proving an affirmative defense." *Id.* at 333.

To satisfy this burden, Chevron relies on the same evidence that it presented in the second step: (1) Ion's unexcused absences from work, (2) his poor performance, (3) his statements to Peel regarding faking a nervous breakdown, and (4) his behavior toward the clinic employees. Reliance on the same evidence under both steps may be adequate;[12] however, the final step

---

[12] *See Pulliam v. Tallapoosa Cnty. Jail*, 185 F.3d 1182, 1186 (11th Cir. 1999) ("In either situation, the reasons—the proof—is the same.").

No. 12-60682

requires the employer to meet a more stringent burden of persuasion and show that it would have taken the same action regardless of the retaliatory motive. *See, e.g.*, *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995).

### 1. Ion's Absences and Poor Performance

In its opinion, the district court considered persuasive the fact that Chevron had begun the disciplinary process against Ion well before he applied for FMLA leave. We believe, however, that evidence of Ion's alleged unexcused absences and poor performance fails to satisfy Chevron's burden. While it is true that Chevron disciplined Ion for his absences and poor performance prior to his application for FMLA leave, it is also true that Chevron's disciplinary response for these actions had already been determined. Chevron's claim that it would have fired him based on his absences and poor performance is disingenuous and contradicted by the evidence. Chevron had the opportunity to fire Ion based on these deficiencies and chose not to do so. As discipline, Chevron elected to suspend Ion for five days and place him on a PIP/AIP. Significantly, Chevron did not indicate to Ion that it was considering further discipline for his prior absences and performance.[13] Instead, Chevron gave Ion a final warning, implying that he had at least one more opportunity to retain his employment. Moreover, Ogborn testified during his deposition that if Ion had returned to work on March 23, 2009, Chevron would have reinstated him. For these reasons, we believe that evidence of Ion's absences and poor performance prior to his suspension does not satisfy Chevron's burden to prove that it *would* have fired Ion despite its retaliatory motive.

---

[13] Although the PIP/AIP contained language about the possibility of further disciplinary action, it suggested that such action would be based on future failure to make significant and sustainable progress. Because Ion was terminated before returning to work, he was not afforded an opportunity to comply with the PIP/AIP.

No. 12-60682

## 2. James Peel's Testimony and Clinic Incident

Next, the district court considered Chevron's claim that it fired Ion because of two incidents that occurred during Ion's suspension: (1) James Peel's allegation that Ion told him he was planning on faking a nervous breakdown, and (2) Ion's alleged abusive behavior toward clinic employees. Ion denies both allegations.

The district court relied on a Fifth Circuit case, *Jackson v. Cal-Western Packaging Corporation*, 602 F.3d 374 (5th Cir. 2010), for the proposition that in assessing Chevron's claim, the proper inquiry is whether Chevron reasonably believed and relied on the information received from its employees in good faith. The court found that Ion had provided no evidence that Chevron's reliance on the reports of employees was in bad faith, and that for this reason, Chevron had met its burden under the final step. However, the case is distinguishable because it was decided with considerably less evidence of retaliatory motive than is present in the instant case.

## 3. *Jackson v. Cal-Western Packaging Corp.*

In *Jackson*, the plaintiff was a sixty-nine-year-old male who was terminated after a coworker complained that the plaintiff had sexually harassed her. *Id.* at 376. The plaintiff claimed that his employer discriminated against him on account of his age. *Id.* In assessing his claim, the court applied the *McDonnell Douglas* burden-shifting framework, in which the employee retains the burden to demonstrate that any legitimate, nondiscriminatory reason the employer proffers for the adverse employment action is in fact pretextual. *Id.* at 377–78.

In *Jackson*, the parties did not dispute whether the plaintiff had alleged a prima facie case. *Id.* at 378. The parties also did not dispute that the plaintiff was fired for a legitimate, nondiscriminatory reason—sexual harassment. *Id.*

21

No. 12-60682

The parties' dispute focused on whether the plaintiff had successfully established that the defendant's reasons for his termination were pretextual. *Id*. at 378–79. In analyzing the claim, the court stated that when considering a case where an employer discharges an employee based on another employee's complaint, "the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith." *Id*. at 379.

In attempting to establish pretext, the plaintiff in *Jackson* presented as evidence (1) his own statements denying that he had made sexually harassing comments, (2) a purported derogatory statement made by a supervisor, (3) evidence of disparate punishment, and (4) a coworker's testimony that she did not perceive his comments to be harassing. *Id*. at 379. However, the court did not credit all of the plaintiff's pretext evidence. First, the court did not consider the evidence of disparate treatment or the coworker's testimony because the plaintiff had failed to identify this evidence in his opposition to the summary judgment motion. *Id*. at 379–80. Second, the district court considered the purported derogatory comment to be a "stray remark" since the plaintiff provided no proof that the comment was proximate in time to his firing or related to his termination. [14] *Id*. at 380–81. Therefore, the only pretext evidence that the court considered in its analysis, besides this "stray remark," was the plaintiff's own statements denying the allegations. *Id*. at 380. With only this evidence before it, the court held that this evidence was insufficient to establish

---

[14] "Comments are evidence of discrimination only if they are '1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.' Comments that do not meet these criteria are considered 'stray remarks,' and standing alone, are insufficient to defeat summary judgment." *Id*. at 380 (citations omitted).

a genuine issue of material fact as to pretext. *Id.* ("This comment alone, or in combination with Jackson's *uncorroborated denial* of any sexual harassment, is insufficient to establish a genuine issue of material fact as to pretext. . . . *Without more*, we simply cannot conclude that there is a triable issue of fact as to whether [the defendant] discriminated against Jackson . . . ." (emphasis added)).

### 4. *Jackson* Is Distinguishable

*Jackson* is distinguishable from the instant case. Unlike the plaintiff in *Jackson*, Ion does not rely solely on his own statements denying Chevron's allegations. Ion has presented significantly more evidence that Chevron was motivated by discriminatory reasons—and not merely reliance on other employees' reports of Ion's misbehavior—than the plaintiff in *Jackson*. Here, Ion has offered an e-mail written by General Manager Melcher, in which Melcher references Ion's attempt to exercise his FMLA rights and asks Ion's supervisor, Ogborn, for "options." The temporal proximity between when the e-mail was sent, when Peel came forward with Ion's alleged statements, when Ion was asked to come to the clinic to sign a medical records release, and when Ion was terminated is noteworthy and raises serious questions about Chevron's motives for terminating Ion.

### 5. Chevron Has Not Established as a Matter of Law that It Would Have Terminated Ion Despite Its Retaliatory Motive

Pursuant to the mixed-motive framework, it is Chevron's burden to prove that it would have terminated Ion despite any retaliatory motive. In arguing that it would have terminated Ion despite any retaliatory motive, Chevron first offers evidence that Ion told his coworker, Peel, that he should fake an illness so that he could take a paid leave of absence pursuant to the FMLA. Ion denies this allegation. In addition, Ion presents the e-mail from Melcher that shows

that Chevron was motivated to retaliate against him for taking FMLA leave. Ion suggests that the timing of Peel's revelation to Ogborn, in light of Melcher's e-mail, is suspicious. Moreover, Chevron concluded that Ion was faking a medical condition after taking Peel's account of the matter at face value without any sort of investigation—despite Chevron's own counselor in its Employee Assistance Program referring Ion to a licensed professional counselor of Chevron's choosing, and that counselor certifying that Ion suffered from a serious health condition as defined by the FMLA. Chevron's failure to conduct even the most cursory investigation, confront Ion about Peel's statements, or seek a second opinion under the FMLA[15] calls into doubt Chevron's reasonable reliance and good faith on Peel's statements, and, at the very least, creates a fact issue as to whether it would have terminated Ion despite its retaliatory motive.

Chevron next offers evidence that Ion was verbally abusive toward clinic employees on March 25, 2009, when asked to sign a GO-153 form. In support, Chevron provides an affidavit by Revere Christophe, a Facility Security Officer, in which Cristophe testifies that he conducted interviews with the clinic employees and concluded that Ion had engaged in "belligerent and abusive conduct toward the nursing staff in the clinic." In addition, Chevron offers a note written by Ogborn in which he describes Ion's demeanor toward the clinic employees as "passive/aggressive harassment" and reports that Ion made the employees feel uncomfortable. Ion again denies this allegation and once more points to Melcher's e-mail as proof of Chevron's retaliatory motive. Ion argues that he was merely asking questions about the GO-153 form, including whether

---

[15] *See* 29 U.S.C. § 2613(c)(1) (2006) ("In any case in which the employer has reason to doubt the validity of the certification provided . . . for leave . . . , the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified . . . for such leave.").

he was required to sign it. When the clinic staff could not answer his questions, Ion claims that he sought answers from Ogborn, Human Resources Manager Johnette Watson, and finally the head nurse, Angela Fortney—none of whom could answer Ion's questions. Ion argues that using his refusal to sign the GO-153 form as a basis for terminating him is a violation of the FMLA and that Chevron's allegations about his behavior are disingenuous.[16] On the other hand, Chevron argues that it did not fire him because of his refusal to sign the form, but for his behavior when asked to sign the form. We find this argument to be without merit.

First, the fact that the termination letter is devoid of any reference to the clinic incident is significant. It is curious that the termination letter would include reference to Ion taking Chevron company equipment home, an act that Watson testified was not wrongful, but include no reference to the clinic incident, which allegedly included concerns of workplace violence. Moreover, when asked during her deposition whether the letter was an accurate statement of the reasons Ion was terminated, Watson, who drafted the termination letter, answered affirmatively. The omission of the clinic incident from the termination letter calls into question whether Chevron truly relied on the clinic incident as a reason for terminating Ion. Second, all accounts of the clinic incident offered by Chevron are vague and include no specific or objective description of Ion's behavior. The accounts do not describe foul language, physical manifestations of anger, or any other description of Ion's behavior outside of Ion asking questions about having to sign the GO-153 form. The failure to bring forth any evidence about Ion's actual behavior calls into doubt Chevron's reasonable belief

---

[16] "If an employee submits a complete and sufficient certification signed by the health care provider, the employer may not request additional information from the health care provider." 29 C.F.R. § 825.307(a) (2013).

and good-faith reliance on the clinic employees' report. Third, because Chevron fails to specify what was abusive about Ion's behavior, it is unclear how related Chevron's concerns about Ion's behavior were to Ion's refusal to sign the GO-153 form. It would be unreasonable, and would undercut the FMLA's protection, to permit an employer to draw any arbitrary distinction between firing an employee for exercising his FMLA rights and for firing an employee for *how* he exercised his FMLA rights. Pursuant to Chevron's view, an employer would be able to fire an employee for raising his voice when opposing an employer's unlawful attempt to violate the FMLA. *But see Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006) (holding that a question of material fact existed where an employer's classification of an employee's conduct as insubordinate stemmed in large measure from its mistaken belief that the employee was not entitled to FMLA leave).

In summation, Chevron has failed to meet its burden and establish as a matter of law that it would have fired Ion despite its retaliatory motive. Chevron's evidence of Ion's history of attendance and performance-related deficiencies is insufficient to establish that it would have fired Ion because Chevron chose to address those deficiencies with a suspension and a PIP/AIP, and Ogborn testified that Ion would have been reinstated had he come back to work. Chevron's evidence that Ion was faking FMLA leave is also insufficient because of the doubts raised by Chevron's failure to investigate and Melcher's e-mail. Finally, Chevron's evidence that Ion had been abusive during the clinic incident is insufficient because it was not mentioned in Ion's termination letter, the accounts of the clinic incident are vague and nondescript, and Chevron has

failed to establish as a matter of law that its concerns about the clinic incident were not related to Ion's refusal to sign the GO-153 form.[17]

## IV.    Conclusion

For the foregoing reasons, we conclude that the district court erred in granting summary judgment in Appellees' favor. We, therefore, **REVERSE** the judgment entered in favor of Appellees and **REMAND** for further proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.

---

[17] As noted above, we conclude that the facts and evidence in this case demonstrate a genuine issue of material fact as to whether Chevron's stated reasons for firing Ion were pretextual. This case is distinguishable from *Jackson* because, in *Jackson*, the only evidence of pretext was "self-serving statements that [the plaintiff] did not commit sexual harassment," which were "insufficient to create a triable issue of fact." 602 F.3d 374, 379 (5th Cir. 2010).