United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 20, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-30422

LIFECARE HOSPITALS, INC.,

Plaintiff- Cross-Appellees,

versus

HEALTH PLUS OF LOUISIANA, INC.,

Defendant- Cross-Defendant,
Cross-Claimant, Appellee,
Cross-Appellant,

versus

CUSTOM-BILT CABINET & SUPPLY, INC.,

Defendants-Cross Claimant-
Cross Defendant Appellant-
Cross-Appellee.

Appeals from the United States District Court
for the Western District of Louisiana

Before KING, Chief Judge, and BENAVIDES and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case involves a three way dispute between an insurance company, an employer, and a

health care provider. Following the sudden and severe illness of employee James Sloan ("Sloan"),

employer Custom Bilt Cabinet & Supply, Inc. ("Custom-Bilt") moved to terminate Sloan's

employment in August 2001. In December 2001, Sloan attempted to extend his health insurance

coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) amendments to the Employment Retirement Income Security Act (ERISA). Nonetheless, Health Plus of Louisiana, Inc. ("Health Plus"), the private insurer that Custom Bilt had contracted with for its employees, refused to reimburse Lifecare Hospital, Inc. ("Lifecare") for Sloan's medical expenses because Health Plus asserted that Sloan failed to timely elect to extend his insurance coverage. Health Plus appeals from the district court's entry of summary judgment granted to Lifecare against Health Plus in Lifecare's action to recover medical expenses. Custom-Bilt appeals from the district court's entry of summary judgment granted in favor of Health Plus that required Custom-Bilt to indemnify Health Plus for medical expenses paid to Lifecare.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2000, Health Plus and Custom-Bilt entered into a Group Service Agreement ("the plan"). Under the plan, Custom-Bilt established a group health plan for its employees and their dependents and Health Plus, through its contracted physicians and hospitals, arranged for medical services to be provided to Custom-Bilt's employees in accordance with terms outlined in the plan. James Sloan was an employee of Custom-Bilt who participated in the plan.

On July 16, 2001, Sloan became seriously ill. He was hospitalized at the Willis-Knighton Medical Center and later diagnosed with Guillain-Barré Syndrome, a life-threatening disorder, considered a medical-emergency, in which the body's immune system attacks part of the peripheral nervous system.[1] The syndrome is characterized by a rapid onset of paralysis sometimes leading to virtual total paralysis. As was the case in Sloan's situation, the breathing muscles often become so

---

[1] NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKES, GUILLAIN-BARRÉ SYNDROME FACT SHEET *available at* http://www.ninds.nih.gov/disorders/gbs/detail_gbs.htm.

weakened that a machine is required to keep the patient alive. By July 31, 2001, Sloan's condition had stabilized and he was transferred to Lifecare Hospital, a long term acute care hospital. He stayed at Lifecare until December 12, 2001.

Meanwhile, Custom-Bilt decided to terminate Sloan's employment. On July 24, 2001, Sloan's wife, Beatrice Sloan, went to Custom-Bilt's office to inquire about her husband's insurance benefits. Mrs. Sloan was very distraught and was primarily focused on learning about Mr. Sloan's death benefits because at that time it was her belief that her husband would not live much longer. Nevertheless, Francis Caldwell, the Custom-Bilt employee who met with Mrs. Sloan, also informed her about the necessity of her husband electing COBRA health insurance coverage. The only written information that Caldwell provided to Mrs. Sloan was a COBRA enrollment form.

On August 13, 2001, Custom-Bilt officially terminated Sloan. Custom-Bilt timely notified Health Plus of the termination. In accordance with the terms of the group health plan, Health Plus terminated Sloan's health care coverage effective August 31, 2001. In late November 2001, Lifecare contacted Custom-Bilt regarding the status of Sloan's health insurance coverage. Upon realizing that Sloan was still alive and had never elected COBRA coverage, Custom-Bilt provided the Sloans with written information regarding Sloan's COBRA rights and provided another election form.

On December 17, 2001, Sloan mailed his completed COBRA election form to Health Plus along with a payment for premiums for the months of September, October, November and December, at a cost of $180 per month. Lifecare, rather than Sloan, actually paid for the premiums. On December 21, 2001, Health Plus received claims from Lifecare for medical services rendered to Sloan between September 1, 2001 and December 12, 2001. Health Plus denied payment of these claims,

3

alleging that Sloan was no longer a member of Health Plus insurance because he did not make a timely election of COBRA continuation coverage.

Lifecare filed suit against Custom-Bilt and Health Plus, alleging that Sloan made a timely COBRA election and that Custom-Bilt and Health Plus were obligated to pay Lifecare $252,154.56 for Sloan's unpaid medical expenses that accrued while he was at Lifecare. Custom-Bilt and Health Plus each filed cross-claims against the other contending that if one was found liable to Lifecare that company was entitled to be indemnified by the other. Each of the parties filed competing motions for summary judgment. The district court issued a Memorandum Ruling granting Lifecare's Motion against Health Plus. The district court found that, as a matter of law, Custom-Bilt's attempt to notify Sloan of his rights to COBRA continuation coverage in July was insufficient, Sloan did not receive a valid COBRA notice until November 2001, and consequently Sloan's December 2001 COBRA election was timely. Because Sloan's December COBRA election was effective retroactive to September 1, 2001, and because Health Plus and Lifecare had an Ancillary Service Agreement that required Health Plus to pay Lifecare for services provided to its members, the district court ordered Health Plus to pay Lifecare $252,154.56. Additionally, the district court held that Custom-Bilt had to reimburse Health Plus because Custom-Bilt failed to satisfy its duty to properly notify Sloan of his COBRA continuation options.

STANDARD OF REVIEW

This court reviews the grant or denial of a motion for summary judgment *de novo*, applying the same legal standards as the district court applied to determine whether summary judgment was appropriate. Flock v. Scripto-Tokai Corp., 319 F.3d 231, 236 (5th Cir. 2003) (citation omitted). Even if we do not agree with the reasons given by the district court to support summary judgment,

we may affirm the district court's ruling on any grounds supported by the record.  Forsyth v. Barr, 19 F.3d 1527, 1534 n.12 (5th Cir.1994).  A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

A.     Lifecare's Motion for Summary Judgment against Health Plus

Health Plus argues that employers are only required to make a good faith attempt to provide an employee with adequate notification of their COBRA rights, which it contends Custom-Bilt did in this instance.  Under the Ancillary Service Agreement between Health Plus and Lifecare, Health Plus was only liable to reimburse Lifecare for hospital services rendered to Health Plus group health plan members.  Even though the plan documents do not set forth a deadline by which a member must elect COBRA continuation coverage, Health Plus submits that the COBRA statute provides that the default election period is sixty days.  Health Plus argues that Mrs. Sloan received notice of Sloan's COBRA rights in July 2001 but did not elect to extend coverage in a timely manner, i.e. within sixty days of Sloan's termination.  Therefore, Sloan was no longer a group health plan member after August 31, 2001, and Health Plus should not be held liable for his medical expenses.  Alternatively, Health Plus argues that there is a material factual dispute as to the sufficiency of the July notice, and the district court erred in granting summary judgment based on the court's assessment that the July notice was insufficient.

Lifecare counters that the district court correctly concluded that Custom-Bilt did not provide adequate notice to Sloan of his COBRA rights nor did Custom-Bilt make a good faith effort to do

5

so. Lifecare notes, *inter alia*, that the July notice came *before* the qualifying event actually occurred (here the qualifying event for COBRA coverage was Sloan's August 13, 2001, termination). Although Mrs. Sloan was told at the July meeting that Sloan would eventually be terminated, she was not told when that would occur. Neither Mr. nor Mrs. Sloan were informed of his termination until after August 13, 2001, which, as Lifecare opines, begs the question of how either of them would have known to elect COBRA coverage if they did not even know the election period had begun.[2] Lifecare asserts that Sloan was not provided with adequate notice of his COBRA rights until December 2001, and his right to elect coverage did not begin until that date. Thus, his election was timely because he elected COBRA continuation coverage within sixty days of the December notification. Because Sloan remained a Health Plus member due to his timely election of COBRA coverage, he was fully insured during his entire stay at Lifecare and pursuant to the Ancillary Service Agreement between Lifecare and Health Plus, Health Plus is obligated to reimburse Lifecare for the $252,154.46 in medical services rendered to Sloan.

For reasons elucidated below, we hold that Sloan's December election was valid and the ruling granting summary judgment to Lifecare should be affirmed albeit for different grounds than those relied upon by the district court.

Lifecare and Health Plus focus their arguments primarily on whether Mrs. Sloan's July meeting with Caldwell, a Custom-Bilt representative, met the minimum statutory requirements for notification of COBRA rights. Health Plus asserts that because the July notice was adequate, Sloan

---

[2] The COBRA election period begins from the later of either the date of the qualifying event or the date that notice was given. 29 U.S.C. § 1165. Thus, assuming the July notification was proper, the election period would be measured from the later date which was the qualifying event, i.e., Mr. Sloan's termination.

6

had until October 31, 2001 to elect COBRA continuation coverage, thus, his December election was untimely. Health Plus bases its argument on the assumption that 29 U.S.C. § 1165 provides a default election period of 60 days—the parties may contract to lengthen it but they may not shorten it. Our reading of § 1165 does not support such an interpretation. Section 1165(1) states:

> The term "election period" means the period which–
> (A) begins not later than the date on which coverage terminates under the plan by reason of a qualifying event,
> (B) is *of at least* 60 days' duration, and
> (C) ends *not earlier than* 60 days after the later of--
> > (i) the date described in subparagraph (A), or
> > (ii) in the case of any qualified beneficiary who receives notice under section 1166(4) of this title, the date of such notice.

29 U.S.C. § 1165 (West 2004) (emphasize added).

The plain language of the statute requires a COBRA election period of at least 60 days, measured from the later of either the date of the qualifying event or the date on which the beneficiary receives notice of his COBRA options. However, as Custom-Bilt observes, the statute does not mandate any outer boundary for the election period. In other words, a beneficiary must have a minimum election period of at least 60 days but the statute is silent with respect to the maximum length of an election period. 26 C.F.R. § 54.4980B-6. This suggests that the parties to an ERISA plan can choose to have an election period of any length, so long as it is at least 60 days long. See National Cos. Health Benefit Plan v. St. Joseph's Hosp., 929 F.2d 1558 (11th Cir. 1991), *abrogated in part on other grounds by*, Geissal v. Moore Medical Corp., 524 U.S. 74 (1998). In the instant case, the plan did not limit the election period in any way. Custom-Bilt argues that since the statute left it to the contracting parties to limit the election period and the plan documents fail to do that, there was no maximum election period here and no immediate deadline by which Mr. Sloan had

7

to elect COBRA coverage. The plan does specify the maximum period that it would provide coverage to the employee or their dependents after the qualifying event. The plan states that Health Plus is only responsible for a terminated employee's health care expenses for eighteen months after termination, subject to certain limiting conditions. Because neither the plan nor the statute limits the election period, Custom-Bilt submits Sloan could elect COBRA coverage anytime within the eighteen month maximum period allotted for continuation coverage. Therefore, even assuming that Mrs. Sloan's July 2001 meeting with Caldwell qualified as an adequate employer provided notification of COBRA rights, Sloan's December 2001 election was still timely because there was no sixty day deadline here. We agree.

As noted above, the plain language of § 1165 only mandates a minimum period that the employee or dependent must be afforded to elect coverage. There is no support in the statute for Health Plus' averment that the 60 day period in § 1165 was meant as the default maximum time frame should the private insurance documents fail to cap the election period. Although we need not look beyond the plain language of the COBRA statute, our reading of § 1165 as applied to this particular case is also consistent with Congress' intent in enacting the COBRA amendments. "ERISA, as amended by COBRA, is remedial legislation which should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans." McGee v. Funderburg, 17 F.3d 1122, 1124 (8th Cir. 1994). Accord Smith v. CMTA-IAM Pension Trust, 746 F.2d 587, 589 (9th Cir. 1984); Rettig v. Pension Ben. Guar. Corp., 744 F.3d 133, 155 n.54 (D.C. Cir. 1984). The COBRA amendments to ERISA were enacted in response to "'reports of the growing number of Americans without *any* health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay.'" Brock v. Primedica,

8

<u>Inc.</u>, 904 F.2d 295, 296 (5th Cir. 1990) (quoting H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S. Code Cong. & Admin. News 42, 579, 622); <u>Tewleit v. Hartford Life and Accident Insur. Co.</u>, 43 F.3d 1005, 1007 (5th Cir. 1995). The intent of Congress in enacting the COBRA amendments was to preserve employees' medical insurance as they move from job to job and prevent the loss of insurance coverage that could accompany any changes in employment. <u>Tewleit</u>, 43 F.3d at 1006, 1008-09.

Health Plus responds that interpreting § 1165 as providing only a statutory minimum election period could theoretically create an infinite election period. Health Plus argues that if the court broadly interprets the election period set forth in the statute, the court must also broadly interpret the period of coverage that the statute mandates that insurers provide. It could be argued, although it is subject to considerable debate, that the COBRA statute only sets out the minimum period(s) of time employer-sponsored health plans must provide continuation coverage and is silent as to the maximum length of time that must be provided.[3] Because the statute does not limit the election period and arguably may not limit the period that coverage must be provided, Health Plus alludes to a hypothetical situation where a beneficiary could attempt to elect coverage even years after he was fired because a plan failed to limit both the election period and the period of coverage.

---

[3] The coverage must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following:
    (A) Maximum required period
        (i) General rule for terminations and reduced hours
        In the case of a qualifying event described in section 1163(2) of this title, except as provided in clause (ii), the date which is 18 months after the date of the qualifying event.
29 U.S.C. § 1162(2) (West 2004).

The facts before us are not analogous to the scenario Health Plus anticipates. We need not pontificate on whether the COBRA amendments allow for infinite employer-sponsored continuation coverage because that is not a question that is currently before the court. The plan here does limit the period of COBRA continuation coverage to eighteen months in the case of an employee who is terminated, or until certain express terminating events occur such as the failure to pay monthly premiums. Moreover, Sloan did not attempt to elect continuation coverage years after his termination; less than 120 days passed between the end of Sloan's employer-provided coverage and his COBRA election.

A reasonable reading of the statute demonstrates that § 1165 only provides a minimum election period. Because the plan documents do not limit the election period, Sloan could have elected coverage any time within the period of continuation coverage provided for in the plan documents. See Branch v. G. Bernd Co., 764 F. Supp. 1527, 1540 (M.D. Ga. 1991) (holding that a summary plan document that did not specify a 60-day election period created an open ended election period subject only to COBRA's maximum length of time that a plan must provide continuation coverage to employees), aff'd, 955 F.2d 1574 (11th Cir. 1992) (J. Reavley, sitting by designation). Even assuming that Custom-Bilt provided adequate notification of his COBRA rights in July, Sloan's election in December was still timely.

It is beyond cavil that after continuation coverage has been elected, coverage begins retroactive to the date the beneficiary otherwise would have lost coverage under the employer-sponsored plan. 29 U.S.C. § 1162(2) ("The [COBRA] coverage must extend for at least the period *beginning on the date of the qualifying event . . .*" (emphasize added)); 42 U.S.C. § 300bb-2; 26 C.F.R. § 54.4980B-6 ("If the election is made during [the election period], coverage must be

10

provided from the date that coverage would otherwise have been lost"); Cf. Teweleit, 43 F.3d at 1008 (stating that Congress' intent in enacting the COBRA amendments was to prevent any gaps in insurance coverage). If the plan beneficiary elects coverage during the election period, there is no gap in coverage between the time they would have lost employer-sponsored coverage and the time they elected COBRA coverage. Sloan was continuously hospitalized at Lifecare from August 1, 2001 until December 12, 2001, when he was transferred to a nursing facility. Pursuant to the group health plan documents, Sloan was scheduled to lose employer-sponsored coverage at the end of the month of the qualifying event, here August 31, 2001. Because Sloan timely elected continuation coverage, he was covered under Health Plus' group health plan retroactive to August 31, 2001. Health Plus already tendered payment to Lifecare for services rendered up through August 2001, and Lifecare is entitled to reimbursement from Health Plus for the balance of the medical expenses for health care services rendered to Sloan.

B.     Health Plus' motion for summary judgment against Custom-Bilt for indemnity

Health Plus readily concedes that if Custom-Bilt did not provide Sloan with sufficient notification of his COBRA rights until December 2001, Sloan's December election was valid and it would be obligated to reimburse Lifecare for Sloan's medical expenses. Health Plus argued to the district court that if it is obligated to pay Sloan's medical expenses, it was entitled to indemnification from Custom-Bilt. Health Plus noted that it had no duty to inform Sloan of his COBRA rights. Health Plus opined that it would only be obligated to pay Sloan's medical expenses if Custom-Bilt negligently failed to provide adequate notification in July; therefore, Custom-Bilt should indemnify Health Plus. The district court agreed and entered judgment for Health Plus against Custom-Bilt.

11

Custom-Bilt argues that the district court erred in ordering it to indemnify Health Plus for the cost of Sloan's medical expenses. We agree.

If Custom-Bilt provided Sloan with insufficient notification of his COBRA rights in July, Sloan's December election was timely. However, as previously explained, even assuming that if Custom-Bilt provided Sloan with sufficient notification of his COBRA rights in July, we find that Sloan's December election was still timely. Thus, Health Plus was obligated to pay for Sloan's medical expenses pursuant to the group health plan documents and the Ancillary Service Agreement regardless of whether Mrs. Sloan's July meeting with the Custom-Bilt representative was an adequate notification. Even assuming Custom-Bilt failed in its July attempt to fulfill its contractual and statutory duty to notify, its failure did not harm Health Plus. Without proving that it was harmed by Custom-Bilt's actions, Health Plus is not entitled to indemnification from Custom Bilt. Because we do not find that Health Plus was damaged by Custom-Bilt, we hold that the district court erred in granting summary judgment for Health Plus against Custom-Bilt.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for Lifecare against Health Plus, and we REVERSE the district court grant of summary judgment for Health Plus against Custom-Bilt.

AFFIRMED in part and REVERSED in part.