# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60771

MICHAEL DALE RAY,

Plaintiff - Appellant

v.

UNITED PARCEL SERVICE; BOB PEDULLA,

Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

November 20, 2014

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:09-CV-95

Before STEWART, Chief Judge, and BENAVIDES and OWEN, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:[*]

Plaintiff-Appellant Michael Dale Ray ("Ray") appeals the district court's grant of summary judgment in favor of Defendants-Appellees United Parcel Service ("UPS") and Bob Pedulla ("Pedulla") on his retaliation claim under the Family and Medical Leave Act of 1993 ("FMLA").[1] We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 29 U.S.C. § 2601 (2012).

No. 13-60771

## I.   FACTUAL BACKGROUND

Beginning in 2003, Ray worked for UPS as one of two managers of the Jackson division, overseeing "Hub, Air and Feeder" operations. Ray served alongside Donald Gentry ("Gentry"), the other Jackson division manager overseeing "Package" operations. For purposes of salary, UPS internally classified Ray as Grade 18 in his role as division manager.

During the next two years and prior to any FMLA leave by Ray, it is undisputed that Ray's superiors noted deficiencies in his performance. In May of 2004, Ray's then-district manager Romaine Seguin ("Seguin") met with Ray and placed him on a Performance Improvement Plan ("PIP"), delineating five areas where failure to improve would lead to unfavorable consequences. In January of 2005, Seguin's replacement as Ray's district manager, Curtis Price, reiterated that the PIP-delineated deficiencies were ongoing and Ray acknowledged in a contemporaneous memorandum of the meeting that "[Ray's] hub was ranked the worst hub each month of [the] last year in the region because of [his] day sort."[2] In his deposition, Ray acknowledged he had taken no action to remedy those deficiencies.

On February 10, 2006, Ray suffered a heart attack. At the urging of UPS, Ray contacted Broadspire, UPS's disability plan administrator, which approved Ray for short-term disability leave until his return to work on May 22, 2006. At the same time, UPS advised Ray to provide a separate notice of FMLA leave to an internal UPS division; the parties dispute whether Ray provided this notice to UPS.

Thereafter, Ray suffered additional health problems, and the Jackson division experienced several negative events. In October of 2006, Ray's division underwent a "Keter audit," a delivery and safety audit performed by an outside

---

[2] ROA.359.

2

consulting group. Ray's division failed to meet the passing score of 95%, scoring below 90% on two of the four audit metrics. As a result of the audit, a Safety Process Improvement Plan was implemented to address the deficiencies. The following November, Ray again experienced heart-related health issues, resulting in his admission to the hospital and a period of short-term disability leave. As before, UPS advised Ray to provide a separate FMLA-leave notice, and the parties again dispute whether Ray provided that notice. Ray returned to work on December 18, 2006.

The majority of events giving rise to this action occurred throughout 2007. In March of 2007, district manager Pedulla met with Ray and other leadership of the Jackson division, at which time Ray was assigned oversight of the Saturday-evening air operations. In April, the Jackson hub experienced hundreds of service failures in the Saturday-evening air operations. UPS defines a "service failure" as any time a package is not processed and moved according to schedule, such that a single truckload of packages can result in hundreds of individual service failures. Though Ray asserts in his brief that two other managers were responsible for this failure, Ray acknowledged his responsibility in his deposition testimony. Ray further acknowledged that there were no previous service failures in his division.

Shortly thereafter, Ray met with two district-level superiors Karl Gramm ("Gramm"), the operations manager, and Roman Williams ("Williams"), the human resources manager. As documented in Ray's memorandum of the meeting, the meeting's purpose was to develop a PIP regarding two areas requiring "consistent improvement," and eight improvement needs in Ray's "leadership skills."[3] Additionally, it was at this meeting that Ray experienced the first of the two adverse employment

---

[3] ROA.362-63.

decisions he alleges, as Gramm and Williams informed Ray that he would not receive his employee stock options for 2007, or any raise in 2008 ("compensation withholding"). At the same time, Gentry was placed on a 90-day probation and told he would lose his stock options and raise (though Gentry was ultimately allowed to keep both options and raise).

On August 17, 2007, the Jackson hub failed another Keter audit, and did not score 95% on any of the four measures. Unlike previous Keter audit failures, this failure resulted in a conference call with region-level UPS employees, including Carolyn Walsh ("Walsh"), the vice president of the West Region. At that meeting, Ray recalls Walsh stating that UPS "would not tolerate anymore [sic] scores of this nature."[4] In response to the Keter audit failure and in anticipation of a Keter re-audit, UPS provided a team to work with Ray from late August to early October to identify potential problems and make corrections. At the end of the review period, the team leader noted by memo numerous issues which Ray had failed to address, despite prior identification in the Keter audit and discussion with Ray.

On August 24, 2007, and as described by Ray's contemporaneous memorandum, a combination of a "failure to communicate and lack of . . . follow up" by the full-time management team resulted in 612 service failures at the Jackson hub.[5] In January of 2008, the Jackson hub failed a Keter re-audit, receiving a score of 78.6%. Shortly thereafter, Gramm and Williams met with Ray, at which time Ray was demoted from Grade 18 to Grade 16 due to a lack of leadership.[6]

---

[4] ROA.323.

[5] ROA.365.

[6] ROA.371.

No. 13-60771

Ray initiated this action in February of 2009, asserting claims under Title VII of the Civil Rights Act of 1964[7] and the FMLA; although Ray asserted his Title-VII claim at the summary-judgment stage below, he has affirmatively abandoned this claim on appeal by conceding that he "did not establish pretext on his race discrimination claims."[8] Upon motion by UPS, the magistrate judge issued its report and recommendation granting summary judgment in UPS's favor, which was adopted by the district court over Ray's objections to the report.[9] Ray now appeals the district court's order.

## II.   STANDARD OF REVIEW

This Court reviews orders granting summary judgment *de novo*, and applies the same standard as the district court below.[10] A summary judgment analysis considers evidence from the entire record, and views that evidence in the light most favorable to the non-movant.[11] Accordingly, a court must refrain from determinations of credibility and evidentiary weight, but rather give credence to all evidence favoring the non-movant; conversely, regarding evidence that favors the movant, we will give credence only to evidence that is uncontradicted and unimpeachable, but disregard evidence the jury is not required to believe.[12] So viewing the evidence, we will find summary judgment is warranted where two conditions are satisfied: first, the movant adduces evidence presenting no genuine issues of material fact and, second, "the movant is entitled to judgment as a matter of law."[13] Regarding the first criteria, a fact is "material" if its resolution could affect the outcome of the

---

[7] 42 U.S.C. § 2000e-2 (2012).

[8] Appellant's Br. 38.

[9] ROA.1841-61, 1909. By the same order, the district court granted Ray's motion to dismiss defendant Pedulla under Federal Rule of Civil Procedure 41. ROA.1909.

[10] *Ion v. Chevron*, 731 F.3d 379, 389 (5th Cir. 2013).

[11] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[12] *See Ion*, 731 F.3d at 389.

[13] Fed. R. Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

No. 13-60771

action,[14] and a "genuine" issue is present "only if a reasonable jury could return a verdict for the nonmoving party."[15] Ultimately, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[16]

## III.   ANALYSIS

### a.  Analytical Framework of FMLA Retaliation Claims

The FMLA prohibits employer interference with the exercise of rights provided under the act, or employer discrimination against any individual for opposing a practice made unlawful under the act.[17] As interpreted by the Department of Labor, this prohibition extends to employer retaliation for the exercise of FMLA rights.[18] Among the rights provided by the FMLA, employees are entitled to "reasonable leave for medical reasons."[19]

Ray asserts the actions of UPS were motivated by retaliatory animus for his taking medical leave under the FMLA. Our approach to such claims is two-fold, first asking whether the plaintiff has presented direct evidence of retaliation and, if not, applying the familiar *McDonnell Douglas*, burden-shifting framework.[20]

### b.  Direct Evidence of Retaliation

As before the lower court, Ray asserts that summary judgment is forestalled by direct evidence of discrimination. We disagree, however, and

---

[14] *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

[15] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

[16] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[17] *See* 29 U.S.C. § 2615 (2012).

[18] *See* 29 C.F.R. § 825.220(c) (2014).

[19] 29 U.S.C. § 2601(b)(2) (2014); *see* 29 U.S.C. § 2612(a)(1) (2014).

[20] *Richardson v. Monitronics, Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) (citing *Hunt v. Rapides Healthcare Sys., Inc.*, 277 F.3d 757, 768 (5th Cir. 2001) (explaining framework initially set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

hold that the district court did not err in finding insufficient direct evidence to prevent summary judgment.

As direct evidence of discrimination, Ray primarily relies upon several comments by various UPS employees. As set out in *Brown v. CSC Logic, Inc.* and applied by subsequent cases, in order for comments to constitute direct evidence, they must be "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."[21] Comments failing to satisfy these requirements are merely "stray remarks" that are independently insufficient to prevent summary judgment.[22] Additionally, in order to constitute direct evidence at this stage of the analysis, the comments must be such that, "if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions."[23]

Ray asserts various comments, accurately set forth by the magistrate judge, as either direct or indirect evidence of retaliation.[24] Although we discuss the sufficiency of these comments as indirect evidence of pretext below, at this stage of the analysis it suffices to note that the comments require inference to support retaliation, and therefore do not constitute direct evidence.

For example, Ray proffers statements that upper-level management made negative comments regarding the medical leave of other UPS employees,

---

[21] *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (alteration in original) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996) (finding, in an age discrimination case, that age-related remarks "may serve as sufficient evidence of age discrimination if the offered comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue")).

[22] *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010).

[23] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993).

[24] *See* ROA.1850.

as well as an article and generalized statement about negative perceptions of medical leave at UPS. To constitute evidence, however, these comments would at least require an inference of a general retaliatory culture at UPS, and a further inference that this general attitude was specifically applied to Ray.

Even where the proffered statements are made directly to or about Ray, such as a supervisor's statement that Ray should not come back to work until he was well,[25] these comments also require inference to demonstrate retaliatory animus. As evidence of these more-direct comments, Ray highlights the affidavit of Cheryl Byrd ("Byrd"), which the district court found did not constitute direct evidence of animus or retaliation against Ray.[26] We agree. In her affidavit, Byrd attests to hearing Lee Sardella ("Sardella"), a district human resources manager, stating that Ray's "condition had improved enough for him to return to work" and that "he had undergone surgery before he came to Texas and returned [to work] immediately."[27] Byrd's affidavit described Sardella's attitude as "very hostile," and how Sardella expressed frustration both with a manager requesting FMLA and with Ray's wife not allowing UPS personnel to speak with Ray.[28]

Sardella's comments satisfy the first *CSC Logic* requirement, since they specifically implicate Ray as a manager requesting FMLA leave. Regarding the temporal-proximity requirement, it is true that, as noted by UPS, Ray does not specify the time that Sardella made the comments—an omission that, absent the prohibited inference in Ray's favor, would prevent satisfaction of this requirement as to either of the adverse employment events. Even inferring

---

[25] ROA.718-19.
[26] ROA.1852.
[27] ROA.1746.
[28] *Id.*

that the comments occurred during Ray's FMLA leave,[29] the comments would precede both the compensation withholding and demotion by at least four months or thirteen months, respectively. As a result, Sardella's comments would be too remote in time to serve as direct evidence regarding the demotion, and on the outer edge of sufficient proximity to the compensation withholding.[30] Continuing the analysis, then, only as to the compensation withholding, the comments fail to satisfy the third *CSC Logic* requirement since Ray does not assert Sardella's involvement in the compensation withholding. As with the other comments, therefore, Sardella's statements are insufficient under *CSC Logic*, and do not prevent summary judgment as evidence of retaliatory animus.

In sum, we hold that Ray did not provide direct evidence that UPS disciplined Ray in retaliation for exercising his right to medical leave under the FMLA. Accordingly, the district court did not err in so finding and in proceeding to the mixed-motive analysis.

### c. Mixed-Motive Analysis

Absent direct evidence, the *McDonnell-Douglas* analysis then proceeds through three, burden-shifting steps. First, the employee must make a prima facie showing of FMLA retaliation.[31] Second, upon the employee's satisfaction of the first requirement, "the employer must articulate a legitimate, non-

---

[29] The affidavit makes such an inference possible, since Sardella's remarks about the inability of UPS personnel to speak with Ray during his FMLA leave is recorded in the present tense. *See* ROA.1746.

[30] *Compare Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576-77 (5th Cir. 2003) (recognizing memo made within two months of termination as direct evidence under *CSC Logic*), *with Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (holding comment made "nearly a year" prior to adverse decision was stray remark under *CSC Logic*), *and Brown v. CSC Logic, Inc.*, 82 F.3d 651, 656 (5th Cir. 1996) (finding that comment made sixteen months prior to adverse decision was stray remark in ADEA claim).

[31] *Richardson v. Monitronics, Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).

discriminatory reason for the adverse employment action."[32] Third, if the employer makes a sufficient showing, "the employee must offer sufficient evidence to create a genuine issue of fact" that the employer's proffered reason is merely a pretext for retaliation or, "although true, is but one of the reasons for its conduct, another of which was discrimination."[33] Finally, if the employee satisfies the third-step showing, the employer may only prevail by proving it would have taken the adverse employment action regardless of the discriminatory motivation; this showing "is effectively that of proving an affirmative defense."[34]

### i.  Ray's Prima Facie Showing

In order for Ray to meet his initial burden of showing an FMLA prima facie case, he must show the following elements: (1) he was protected under the FMLA, (2) he suffered an adverse employment action, and (3) the adverse action was taken because he sought protection under the FMLA.[35] On appeal, it is undisputed that Ray was protected under the FMLA. At the summary-judgment stage below, UPS challenged Ray's satisfaction of this requirement by arguing that Ray provided insufficient notice of FMLA leave.[36] However, the district court found that Ray provided notice sufficient to invoke the protection of the FMLA.[37] UPS does not re-assert its insufficient-notice challenge on appeal, and it is therefore waived.[38] Regardless, we have held that the FMLA provides protection where notice "is sufficient to reasonably apprise [the employer] of the employee's request to take time off for a serious health

---

[32] *Id.*

[33] *Id.*

[34] *Id.* (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).

[35] *See Ion v. Chevron*, 731 F.3d 379, 390 (5th Cir. 2013) (citations omitted).

[36] *See* ROA.401-02.

[37] *See* ROA.1848-49.

[38] *See Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

condition."[39] As it is undisputed that UPS was aware both of Ray's medical condition and of his request for short-term disability benefits, Ray provided notice sufficient to invoke the protections of the FMLA, satisfying the first element.

Regarding the second element, it is similarly undisputed that Ray suffered adverse employment actions, first in the compensation withholding, and second in his demotion.

Turning to the third element, UPS challenges Ray's prima facie showing of causation for the first time on appeal. Since UPS did not assert any argument against prima facie causation before the district court, UPS has waived this challenge on appeal. UPS acknowledges that the lower court did not specifically discuss causation in its analysis, but attempts to justify our consideration of its causation challenge by relying on the principle that we may affirm summary judgment "for any reason supported by the record."[40] Equally well-settled, however, is the principle that the scope of appellate review on a summary judgment order is limited to matters that the parties presented to the district court, such that the district court has an opportunity to rule on the challenge.[41] Though the district court necessarily and generally addressed Ray's causation showing as part of the later stages of the mixed-motive analysis, a point advanced by UPS, the district court made no such ruling at the prima facie stage because UPS did not make prima facie causation an issue, an omission which was expressly noted by the district court.[42] Of UPS's arguments on appeal, only UPS's arguments against comparators were presented to the district court, but then only as rebuttal to Ray's pretext

---

[39] *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995).

[40] Appellees' Br. 18 n.7 (citing *Lifecare Hosps., Inc. v. Health Plus of La., Inc.*, 418 F.3d 436, 439 (5th Cir. 2005).

[41] *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339-40 (5th Cir. 2005).

[42] *See* ROA.1853, n.7.

showing.[43] Based on the principle that a party "must press and not merely intimate the argument during the proceedings before the district court,"[44] we will not re-cast these elsewhere-asserted, comparator references as arguments against prima facie causation. Accordingly, UPS has waived any argument on appeal that Ray cannot establish prima facie causation.

### ii.  UPS's Legitimate, Non-Retaliatory Reason

Proceeding to the second step of the mixed-motive analysis, UPS bears the burden of showing a legitimate, non-retaliatory reason for taking the adverse employment actions.[45] UPS asserts its satisfaction of this burden based on evidence that Ray demonstrated various leadership issues, as exhibited by performance measures preceding his first FMLA leave period, and continuing until well after his second FMLA leave ended. In finding that UPS satisfied its burden, the magistrate judge found that UPS provided evidence that Ray was subject to adverse actions "because he repeatedly demonstrated a lack of leadership through his work performance."[46]

UPS distinguishes between the performance issues justifying the two adverse events at issue. Regarding the compensation withholding, UPS asserts this action was warranted by the combination of Ray's pre-leave performance issues, the post-leave delivery failures in April of 2007, and the identification of other problems requiring Ray's consistent improvement.[47] As to the demotion, UPS explains this action by reference to: the April-2007 delivery failures; the failed August-2007 Keter audit; the August-2007 delivery failures;

---

[43] *See* ROA.1403.

[44] *Keelan*, 407 F.3d at 340.

[45] *Richardson v. Monitronics, Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).

[46] ROA.1853.

[47] Appellees' Br. 22.

No. 13-60771

Ray's failure to implement prescribed remedial steps; and the failed January-2008 Keter re-audit, which immediately preceded his demotion.[48]

Ray contests this finding by asserting that no evidence supported Ray's demotion for performance issues beyond a single letter, challenging the admissibility of that letter as not in an affidavit form, and challenging the probative value of the letter as not discussing performance issues pre-dating Ray's FMLA leave.[49] Ample other evidence, however, provided sufficient support for the finding and we need reach no conclusion on the merits of Ray's arguments. As noted by the magistrate judge in its summary of Ray's performance failures, UPS's proffered reason was supported by multiple evidentiary sources, including the deposition testimony of Ray himself.[50] Since this finding is otherwise undisputed, UPS has met its burden of showing Ray's performance issues as a legitimate, non-retaliatory reason for taking the adverse employment actions.

### iii.  Ray's Pretext Showing

Proceeding, then, to the third stage of the analysis, the burden again shifts to Ray to present evidence creating a fact issue that UPS's proffered reason either is a mere pretext for retaliation and "false or unworthy of credence" (pretext alternative), or, although true, is but one of the motivations for the adverse action, another of which was retaliation (mixed-motives alternative).[51] Ray's arguments center on exposing UPS's reason as pretext, an inquiry which focuses on whether UPS's explanation was the true basis of its

---

[48] *Id.*

[49] Appellant's Br. 45-47.

[50] ROA.323, 1381-82, 1842-45, 1853-54.

[51] *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347-48 (5th Cir. 2013) (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011)).

13

action, "the real reason," rather than on the accuracy of the explanation.[52] Accordingly, in the summary-judgment context, Ray's burden requires production of evidence that raises a genuine issue of material fact that retaliation, not Ray's performance, was the real reason for the adverse employment events. In addressing this burden, Ray's arguments center on (1) evidence of his good performance, (2) the temporal relationship between the events at issue, (3) disparate treatment, and (4) comments by UPS employees. We consider these arguments *seriatim*. Ray presents further arguments, as he did before the district court, in a conclusory manner and without citation to supporting evidence; due to those insufficiencies, we refuse to consider those arguments.

### 1. *Evidence of Good Performance*

Ray first asserts that UPS's proffered, performance-based reason is false in light of evidence that his performance was good, and that it did not justify the adverse employment actions.[53] Though this argument was not directly presented to the magistrate judge, it was considered by the district court as an oblique objection to the report and recommendation. For the reasons enumerated below, however, Ray's good-performance evidence is insufficient to meet his burden.

"Our job as a reviewing court conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions."[54] In *Haverda v. Hays County*, we explained that a showing that an employer's belief was incorrect "merely implies that an employer may have made a mistake in deciding to take action against an employee," and that "even an incorrect belief

---

[52] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003).

[53] *See* Appellant's Br. 48-50.

[54] *LeMaire v. La. Dep't of Transp. and Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).

No. 13-60771

that an employee's performance is inadequate qualifies as a legitimate reason" to take an adverse employment action.[55] Consistent with the requirement that an employee's evidence must support an inference of the employer's "retaliatory motive, not just an incorrect belief,"[56] we have held that an employee's mere challenge to the underlying facts of an employer's decision, or the employer's assessment of those facts, are insufficient to create a fact issue of pretext.[57]

As we noted previously, UPS asserts that its lack of confidence in Ray's leadership primarily resulted from events occurring in 2007 and early 2008. The majority of Ray's evidentiary proffer, however, does not implicate the relevant time period or UPS's asserted bases. As an example of evidence that pre-dates the events cited by UPS, Ray cites to two awards he received for aspects of his performance in 2004, three years prior.[58] Additionally, Ray cites to a planned transfer to Denver and his assignment to Saturday-evening air operations as evidence of UPS's confidence in his performance.[59] Even making an inference in Ray's favor that the planned transfer and assignment indicate his good performance prior to these events, these events are not probative of the period cited by UPS; indeed, the service failures in the Saturday-evening

---

[55] 723 F.3d 586, 596 n.1 (5th Cir. 2013).

[56] *Id.*

[57] *LeMaire*, 480 F.3d at 391 (5th Cir. 2007) (holding that "[s]imply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext" (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) (holding that "[m]erely disputing [the employer's] assessment of [the employee's] performance will not create an issue of fact"))).

[58] UPS proffers evidence that Ray was cited for performance issues as early as May of 2004. However, UPS relies upon this history to demonstrate that its history of disciplining Ray preceded his FMLA leave, rather than to establish the events precipitating the adverse employment decisions. Therefore, even assuming that the awards challenge UPS's characterization of Ray's performance during that time, the awards neither challenge UPS's non-retaliatory reason nor establish retaliatory animus since these events occurred prior to Ray's FMLA leave.

[59] *See* Appellant's Br. 19, 49.

operations support UPS's proffered reason only because those failures occurred *after* Ray was assigned responsibility for those operations.

Ray additionally proffers his scores on corporate scorecards, called QPRs, in which Ray's scores "were generally in the middle of the pack."[60] Still, these scores fail to show Ray's good performance in a way that challenges UPS's asserted reason or demonstrates retaliatory animus. First, the evidence does not describe QPRs as providing a universal measure of performance, with the supporting testimony cited by Ray describing QPRs as just "one portion" of the UPS evaluation.[61] Further, Ray does not produce evidence that the QPRs referenced or incorporated the confidence-diminishing events proffered by UPS, i.e. Ray's PIP-satisfaction failure, the two service failures in 2007, or the audit and re-audit failures in 2007 and 2008, respectively.

Only through Ray's argument that the Keter re-audit was improperly scored does Ray directly attack any of the bases proffered by UPS. As he did before the district court, Ray asserts that the proper score should have been significantly higher such that it would not support his demotion. Even crediting the evidence upon which Ray relies, this argument merely challenges the underlying facts of UPS's decision and, since "even an incorrect belief that an employee's performance is inadequate qualifies as a legitimate reason,"[62] it is insufficient to create a fact issue that UPS's reason was pretext.

### 2. *Temporal Proximity*

Ray next argues that UPS's reason is unsupported by temporal proximity. Specifically, Ray argues that, if the time periods between his FMLA leave and the adverse employment decisions are too long to indicate retaliatory animus, then his disciplinary history preceding his FMLA leave should not

---

[60] *See id.* at 49.

[61] ROA.591.

[62] *Haverda v. Hays Cnty.*, 723 F.3d 586, 596 n.1 (5th Cir. 2013).

support UPS's non-retaliatory reason.[63] The district court below found that this argument lacks merit,[64] and we agree.

It is true that temporal proximity, or a lack thereof, may be probative of a retaliatory connection between an adverse employment action and the taking of FMLA leave.[65] In this respect, Ray's pretext argument is not supported by the lengthy periods between Ray's FMLA leave and the two adverse employment decisions, respectively four and thirteen months later. It is also undisputed that the precipitating events cited by UPS were highly proximate to the adverse employment decisions. Ray's division experienced a major, service-failure incident immediately prior to the compensation withholding, and a failed Keter re-audit immediately prior to his demotion. As a result, we agree with the district court that temporal proximity supports, rather than vitiates, UPS's non-retaliatory reason.

Ray also argues that the close temporal proximity of UPS's discipline of three employees who took FMLA leave is evidence of retaliatory intent sufficient to establish pretext, specifically citing to UPS's discipline of Ray and Gentry in January of 2008, as well as the transfer of Paul Smith, another branch manager, to a remote division after his return from FMLA leave.[66] Ray's argument, however, is premised upon viewing these three employees as a collective unit, an approach which does not accommodate the individualized consideration that our jurisprudence requires for inferring retaliatory intent by comparing or contrasting treatment of different employees.[67] Highlighting

---

[63] Appellant's Br. 50-51.

[64] *See* ROA.1854-55.

[65] *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006).

[66] *See* Appellant's Br. 34-35, 44.

[67] *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009) (discussing degree of similarity required for inferring intent from disparate treatment).

this concern, Ray, Gentry, and Smith differ in critical respects. Regarding the temporal relationship between FMLA leave and the adverse action, UPS's January-2008 discipline occurred immediately after Gentry's return from FMLA leave, but fully thirteen months after Ray's return from FMLA leave; as to Smith, Ray addresses neither the timing of Smith's discipline nor its temporal relationship to his FMLA leave. Similarly, the employees present different or unknown disciplinary histories, as Ray's past PIPs stand in contrast to Gentry's lack thereof, and the record is silent as to Smith's history. Lastly, the employees differ even as to the substantive adverse employment actions, i.e. Ray's demotion, Gentry's compensation withholding, and Smith's transfer. Therefore, notwithstanding the temporal confluence of the adverse actions against Gentry and Ray, we reject inferring retaliatory intent from disparate employees demonstrating such divergent characteristics.

### 3. *Evidence of Disparate Treatment*

In attempting to make his pretext showing, Ray further relies on the concept of disparate treatment, by which pretext may be shown "where an employer treats one employee more harshly than other similarly situated employees for nearly identical conduct."[68] Ray broadly argues that UPS's justification for the adverse action is pretextual because, though no division manager had passed a Keter audit in the previous four years, only Ray and Gentry suffered as a result of their failures.[69] UPS responds, as it did in its summary-judgment reply below, that the basis of Ray's demotion was not a single instance of audit failure, but instead was a series of failures comprising "a specific delivery failure incident in April [of] 2007, and that he was demoted because of a series of specific problems in late 2007, culminating in the re-audit

---

[68] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (internal quotation marks omitted).

[69] Appellant's Br. 27.

failure in January 2008."[70] Ray's comparison does not account for the series of events precipitating the compensation withholding and demotion, a point illustrated by the employees he proffers for comparison.

Under our precedent, the employees being compared will evidence disparate treatment where they present "nearly identical" circumstances, with the practical effect that comparators must share the same job or responsibilities, the same supervisor, the same conduct leading to the adverse decisions, and essentially comparable violation histories.[71] At the same time, we have clarified that whether comparators demonstrate sufficient similitude does not require disciplinary history to evince the same labels, but instead "may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction."[72]

Ray first cites to Gentry as a comparator, asserting that differences in UPS's disciplinary responses evidence retaliatory intent. After the first service failure in April of 2007, at which point only Ray had taken FMLA leave, Ray was disciplined with the compensation withholding while Gentry was placed on a 90-day probation.[73] After the Keter re-audit failure in 2008, when both Ray and Gentry had taken FMLA leave, Ray was demoted and Gentry was subjected to compensation withholding. It is true that, as a potential comparator, Gentry shared significant similarities with Ray, including supervisors and the event leading to the discipline. Nevertheless, the district

---

[70] Appellees' Br. 34.

[71] *Lee*, 574 F.3d at 260.

[72] *Id.* at 261 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)).

[73] As noted above, though Gentry was threatened with compensation withholding, that threat never materialized.

court found that Gentry was not a sufficiently similar comparator due to differences in his and Ray's disciplinary histories.[74] We agree.

At the time of the 2007 service failure, Ray had already been subjected to two previous PIPs for performance issues, while Gentry had no such history. Indeed, the disciplinary progression from PIP-probation, to compensation withholding, to demotion is consistent with UPS's treatment of both Ray and Gentry. Reinforcing the consistency of this progression, Ray's argument is further undercut by his memorandum following the August-2007 service failure, to which Ray responded by withholding recommendations for raises and stock options for the supervisors involved, and also recommending that future failures by those individuals would result in "possible job status change."[75] The comparison with Gentry does not satisfy Ray's burden.

Beyond his argument involving Gentry, Ray asserts that the following employees did not take FMLA leave and did not receive adverse employment actions: (1) Jim Lewis, Ray's replacement as division manager, who has had service errors; (2) Jeanne Lawrence, a package division manager with service errors; (3) Williams, the human resources director during the failed audits; (4) Dan Kulceski, a New Orleans division manager who failed audits; (5) Derrick Craft, a division manager who violated UPS's workers' compensation policy; (6) Gramm, who committed an integrity violation; (7) Willie Walton, a New Orleans division manager with service failures; and (8) John Wright, a plant engineer during a failed audit.[76]

As the district court correctly concluded, these purported comparators are not sufficiently similar to establish pretext. Several of the would-be comparators, such as Williams, Gramm, and Wright, did not occupy the same

---

[74] ROA.1855-56.
[75] ROA.366.
[76] Appellant's Br. 28-33.

position as Ray at the time of the adverse employment actions. Among those who did occupy substantially similar positions as division managers, such as Lawrence, Kulceski, Craft, and Walton, none are characterized by the same disciplinary history of repeated audit, re-audit, and service failures. Although some of these managers had isolated service or audit failures that roughly correlate to Ray's failures, none demonstrated the combination thereof which collectively represented Ray's "leadership issues." In sum, Ray has failed to provide evidence of disparate treatment sufficient to prevent summary judgment.

### *4. Comments as Pretext Evidence*

As evidence of pretext, Ray relies upon the same comments he cited for his direct-evidence showing. For slightly different reasons, however, these comments are insufficient to show pretext. As we noted above, comments offered as direct evidence are evaluated under the four-part test described in *CSC Logic*. After the Supreme Court's admonition in *Reeves v. Sanderson Plumbing Products, Inc.*,[77] however, we have evaluated comments in the pretext stage under either the *CSC Logic* standard set out above, or the more-lenient, two-part standard in *Russell v. McKinney Hospital Venture*,[78] by which a plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.[79] Under decisions by which we are bound, we have recognized that *Russell* often guides evaluation of comments presented as circumstantial evidence "alongside other

---

[77] 530 U.S. 133 (2000).

[78] 235 F.3d 219, 226 (5th Cir. 2000).

[79] *See Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) (citing *Russell*, 235 F.3d at 225).

No. 13-60771

alleged discriminatory conduct,"[80] but we have also held that *CSC Logic* remains applicable "at least where the plaintiff has failed to produce substantial evidence of pretext."[81]

Since we have considered the remainder of Ray's evidentiary proffer and found it insufficient, Ray has failed to produce substantial evidence of pretext outside of the comments, and we therefore apply the *CSC Logic* standard. To review, under *CSC Logic*, a comment is probative of retaliatory intent where it is "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."[82] Whereas the necessity of inference previously ended our analysis of these comments as direct evidence, at the pretext stage the analysis continues to apply the *CSC Logic* requirements. Upon such consideration, these comments do not constitute evidence establishing pretext and preventing summary judgment.

Many of the comments cited by Ray do not relate to the adverse employment decisions at issue, because they relate to other individuals, such as an alleged comment by Pedulla questioning the legitimacy of another employee's basis for FMLA leave, or because they are too vague to warrant an

---

[80] *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012); *see also Laxton*, 333 F.3d at 583 n.4 (noting that *CSC Logic* is applicable to comments submitted as direct evidence).

[81] *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001); *see id.* at 404-05 (noting that "the Supreme Court faulted [this Court's] decision in *Reeves* not for applying the stray remarks doctrine, but for failing to accord proper weight to the plaintiff's substantial evidence of pretext" (citation omitted)); *see also Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000) (a post-*Reeves* opinion applying *CSC Logic* where plaintiff had only presented comments as evidence of discriminatory intent).

[82] *Rubinstein*, 218 F.3d at 401 (alteration in original) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).

inference of a relationship, such as an alleged comment that another employee wanted Ray's job. Other comments, such as Keith Graham's warning to Ray that he would be under a lot of pressure upon his return from FMLA leave, are allegedly made by individuals with no authority over the employment decision at issue. As previously discussed, the comments recounted in the Byrd affidavit fail to meet the *CSC Logic* standard. We hold that the comments proffered by Ray fail to establish that UPS's non-retaliatory reason was pretext.

### iv.  *Adverse Decision Despite FMLA Leave*

Even were we to proceed as though Ray had made his pretext showing, we agree with the district court below that UPS has nevertheless presented sufficient evidence to satisfy its showing that it would have taken the adverse employment actions regardless of Ray's exercising his rights under the FMLA.[83] UPS presented evidence that it initiated performance-improvement measures prior to Ray's FMLA leave. Additional undisputed evidence, including Ray's own memorandums, reflects that the progression of those disciplinary measures was responsive and temporally proximate to performance failures. This evidence strongly supports UPS's performance-based reason, and Ray has provided no evidence allowing a reasonable inference that UPS would not have taken this action absent Ray's FMLA leave.

## IV.  CONCLUSION

For the above stated reasons, we AFFIRM the judgment of the district court.

---

[83] *See Richardson v. Monitronics, Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).