# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 16, 2021

Lyle W. Cayce
Clerk

No. 20-30289

Leisha Lindsey,

*Plaintiff—Appellant*,

*versus*

Bio-Medical Applications of Louisiana, L.L.C., *incorrectly named as* Fresenius Medical Care Louisiana Dialysis Group L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:18-CV-680

Before Ho, Oldham, and Wilson, *Circuit Judges*.
James C. Ho, *Circuit Judge*:[*]

The Family and Medical Leave Act ("FMLA") not only entitles eligible workers to take unpaid, job-protected leave for certain specified family and medical reasons. 29 U.S.C. § 2615(a)(1). It also protects workers

---

[*] Judge Oldham concurs in the judgment only.

from discriminatory retaliation from their employers in the event they choose to take FMLA leave. *Id.* § 2615(a)(2).

Leisha Lindsey presented prima facie evidence that, after 17 years of dutiful service, her employer, Bio-Medical Applications of Louisiana ("BMA"), terminated her because she was compelled to take FMLA leave in response to a series of personal tragedies. BMA claims she was fired for poor attendance. But employment records suggest BMA offered attendance issues as a *post hoc* rationalization to justify her firing. BMA also claims she was fired due to a series of missed deadlines. But summary judgment evidence suggests these were hortatory rather than mandatory deadlines, and that she was never informed that failure to meet these deadlines could result in discipline of any kind, let alone termination.

We therefore hold that the district court erred in granting summary judgment to BMA on her FMLA discriminatory retaliation claim. But we agree that her remaining claims do not survive summary judgment. Accordingly, we affirm in part and reverse in part and remand for further proceedings.

## I.

Leisha Lindsey began working for BMA in January 1999 as a staff registered nurse and rose through the ranks over the next 17 years. She earned two promotions within four years, rising to the position of Director of Nursing at BMA's clinic in Bunkie, Louisiana. She became Clinic Manager in 2008, a position she held until BMA terminated her in August 2017.

By all accounts, Lindsey was a stand-out employee for nearly her entire tenure. Her supervisor, David Powe, described her as a "really good clinic manager." She received either a "meets standards" or a "commendable" rating on each of her performance evaluations through 2015.

No. 20-30289

But things changed after a series of personal tragedies forced her to take FMLA leave in 2016.

Lindsey experienced a fire in her home on July 5. She took one week of leave as a result. Then her son was hospitalized, prompting her to extend her leave for another month.

BMA approved Lindsey's leave under the FMLA through August 15. Even so, she voluntarily continued to perform some of her job responsibilities while on leave, and she told her team that she would "still be available to all of you by text or phone if anyone needs anything." She also communicated at irregular intervals with Powe and other colleagues via email and text about various work-related issues.

On August 31, two weeks after Lindsey returned to work, she attended a meeting with Powe and a coworker named Cecelia Robinson. During that meeting, Robinson suggested that BMA could "distribut[e] medication that came in for deceased patients to other patients." Lindsey objected, stating that "we're not going to do that here," and later followed up with an email to Powe on September 2 explaining why she believed Robinson's proposal was both illegal and unethical. Powe read the email that morning.

Later that same day, Powe prepared a "Corrective Action Form," claiming that he had received reports from other employees that Lindsey "wasn't at work" before she took leave several months earlier. He issued the disciplinary form to her the following week.

This was the first disciplinary action that Lindsey had ever received in her 17 years of service with BMA. The form stated that Lindsey "ha[d] not been consistently present . . . at the facility during normal hours," and that this was "affecting the moral [sic] and operations of the facility." It did not list specific dates or times of her purported absences, however, and Powe was unable to recall them later.

3

Powe reevaluated Lindsey's attendance a few weeks later and determined that she was improving. Nevertheless, he issued a second Corrective Action Form on January 30, 2017, that upgraded BMA's disciplinary action to a "Final Written Warning." Powe explained that he issued the form because Lindsey's attendance "was going back to where it was." Unlike the first disciplinary form, however, this warning cited three specific incidents of Lindsey's absenteeism. The first occurred on September 28, 2016, when Powe was unable to reach Lindsey by text message because "she had come in at 10:20 AM" and "had left her phone on her desk" while she was "in the front." The second occurred on January 11, 2017, when Lindsey advised her secretary that she would be out sick but neglected to inform Powe directly. The third occurred on January 16, 2017, when some BMA employees texted Powe that they had been unable to locate Lindsey that morning. Lindsey objected to both disciplinary forms and refused to sign them.

Lindsey repeated her objections in a February 1 email to Powe and a February 6 email to Powe's supervisor, Carol Dark. Lindsey's email to Dark complained that she "believed she was being written up as part of her returning from leave of absence." Dark discussed the email with Powe, but it is unclear whether she reported Lindsey's complaint to HR. Lindsey claimed that Dark never investigated the complaint and remained "clueless as to facts as they truly are." Lindsey then began clocking in and out of work to "prov[e] to [Powe and everyone] else" that she was attending work. Powe asked her to stop because Lindsey was an exempt employee and "[e]xempt people don't clock in and out."

On March 21, 2017, Lindsey received a performance evaluation signed by Powe and Dark with an overall rating of "needs improvement." She had never received a rating that low in her then-18 years with BMA. The evaluation noted that Lindsey "had some issues of not meeting management

expectations of being present at the facility during normal operating hours." But it also noted that Lindsey "made improvements in 2017" and that "[s]taff morale ha[d] also improved."

Also in early 2017, a government contractor named Network 13 consulted with BMA about participating in a "catheter tracking" project. Lindsey was asked to help with the project and to submit a monthly tracking report to Lynda Ball, Network 13's Quality Improvement Director, by the fifth day of each month. Lindsey understood the fifth to be merely a suggested date and regularly submitted her report after the fifth of each month. Ball sent Lindsey email reminders asking for the monthly report on March 8, May 8, June 5, and July 7, 2017. Ball sent a follow-up email on July 12, copying Dianne Garrand, BMA's Vice President of Quality. Garrand and Powe attempted to reach Lindsey on July 13 but were unsuccessful. Lindsey later attributed this to her attendance at a manager training meeting, a contention that Powe disputed.

Powe then met with Dark and BMA's HR officer to discuss the July 13 incident and Lindsey's future employment. They all agreed that Lindsey should be terminated. So Powe prepared a termination form and issued it to Lindsey on August 1, 2017. The form referenced Lindsey's prior warnings for "Work Attendance" and explained that Lindsey "ha[d] not [met] expectations outlined in [those] warning[s] as to being present at the facility during normal work hours." It also mentioned Powe's inability to reach Lindsey on July 13 and the fact that Lindsey "ha[d] been late with [her catheter tracking report] almost every month since the project started." Lindsey wrote on the form that "[t]his is bogus and has been the ploy from the beginning. I do not agree with anything on this."

Lindsey sued BMA in the United States District Court for the Western District of Louisiana. She brought four claims—two under the

No. 20-30289

FMLA for interfering with her leave and retaliating against her for taking leave, one for a violation of Louisiana's whistleblower statute, and one for intentional infliction of emotional distress.

BMA filed a motion for summary judgment on all claims, which the district court granted. Lindsey timely appealed all dismissed claims except her state law claim for intentional infliction of emotional distress. (She also appeals the district court's refusal to consider her sworn declaration on the ground that the substance of her declaration should have been argued in brief, and that her brief was already at the maximum page limit established under Local Rules. We need not consider this challenge because the remainder of the record provides sufficient evidence for us to address her claims.)

We review a district court's grant of summary judgment de novo. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). "We ask whether the movant has shown 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 280 (5th Cir. 2020) (quoting FED. R. CIV. P. 56(a)). A genuine dispute exists "when the evidence is such that a reasonable jury could return a verdict for the non-movant" after taking the facts "in the light most favorable" to her. *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 549–50 (5th Cir. 2012) (quotation omitted).

## II.

On appeal, Lindsey contends that the district court erred in granting summary judgment on her FMLA interference claim, her FMLA discriminatory retaliation claim, and her claim under the Louisiana whistleblower statute. We address each in turn, concluding that the district court erred with respect to her claim for discriminatory retaliation under the

No. 20-30289

FMLA, but properly granted summary judgment on her FMLA interference claim and her Louisiana whistleblower claim.

**A.**

Lindsey alleges that BMA pressured her to work while she was on leave, and thereby interfered with her rights under the FMLA.

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA. 29 U.S.C. § 2615(a)(1). We have interpreted this provision to impose liability on the employer if "(1) [the plaintiff] was an eligible employee; (2) [her] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of [her] intention to take FMLA leave; and (5) [her] employer denied [her] the benefits to which [s]he was entitled under the FMLA." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). One FMLA benefit to which employees are entitled is "12 workweeks of leave during any 12-month period" due to certain qualifying conditions such as a serious health condition of a child. 29 U.S.C. § 2612(a)(1).

"Giving employees the option to work while on leave does not constitute interference" with that benefit. *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018). But coercing an employee to work while on leave by making the work "a condition of continued employment" would constitute impermissible interference. *Id.*

The district court granted summary judgment to BMA on Lindsey's FMLA interference claim after concluding that Lindsey "fail[ed] to state a single manner in which she was prejudiced" by BMA's conduct while she was on leave.

Lindsey contends that the district court would have come to a different conclusion had it considered statements in her sworn declaration describing the pressure she felt to work. For example, her declaration states that she "believed that [she] was required to perform [certain] job duties as no one was assigned" to them while she was on leave and that "Powe and other [BMA] employees remained in contact with [her] by telephone and email."

But even if we were to consider Lindsey's declaration, it does not help her for two reasons. First, it has long been the rule that "a party [may not] defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). Lindsey's deposition testimony squarely contradicts her assertion that BMA "required" her to continue working. In fact, the record indicates that the work she did while on leave was voluntary.

Lindsey testified that she was unable to access her company email account and other internal systems while she was away. She also testified that she "just took care of" her responsibilities without any of her supervisors asking her to. This testimony aligns with Powe's statements during his deposition that he only contacted Lindsey during her leave when he "was looking for something" like forms or other materials in her office. Furthermore, Lindsey admitted that she "notified her team that she was going to be on a leave of absence" and told the team she would "still be available to all of you by text or phone if anyone needs anything. If not immediately, just leave me a message and I'll get back to you as soon as possible."

Second, the statements in her declaration would not be sufficient in any event. The coercion theory on which Lindsey relies requires her to demonstrate that BMA made working on leave a "condition of continued

employment," or that BMA threatened her with an adverse consequence. *See D'Onofrio*, 888 F.3d at 210. But she points to no such evidence, either in her declaration or elsewhere in the record. All she can muster is a "belie[f] that [she] was required to perform [her] job duties" based on the fact that "no one [else] was assigned to perform the[m]." None of this demonstrates that BMA ever required Lindsey to perform her job duties while she was on leave as a condition of continued employment.

We therefore affirm the entry of summary judgment on Lindsey's FMLA interference claim.

## B.

Lindsey also alleges that BMA retaliated against her when she returned to work from her FMLA leave. She asserts that her decision to take leave was a determinative factor in BMA's decision to fire her.

The FMLA creates a cause of action for retaliatory discharge. *See Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) (citing 29 U.S.C. § 2615(a)(2)). The prima facie elements of this cause of action are (1) the employee "engaged in a protected activity" under the FMLA, (2) "the employer discharged" the employee, and (3) a "causal link [exists] between the protected activity and the discharge." *Id.*

Plaintiffs who establish a prima facie case are entitled to a "presumption that the employer unlawfully discriminated against" them. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 & n.7 (1981). But where the employee fails to provide "direct evidence of discriminatory intent," the employer can rebut the presumption of discrimination by "articulat[ing] a legitimate, nondiscriminatory reason for the adverse employment action." *Richardson*, 434 F.3d at 332. This does not require the employer to "persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. "It is sufficient if the

defendant[] . . . clearly set[s] forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* at 254–55.

If both the employee and the employer meet their initial burdens, "the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination." *Richardson*, 434 F.3d at 332–33.

Neither Lindsey nor BMA object to the district court's holdings that (1) Lindsey established a prima facie FMLA retaliation case and (2) BMA articulated two nondiscriminatory reasons for its termination decision— Lindsey's attendance issues and her late Network 13 reports.

But the parties dispute the district court's analysis of Lindsey's claim of pretext. The district court agreed with Lindsey that BMA's attendance reason was pretextual. But the district court concluded that she failed to show how BMA's reliance on the missed deadlines was pretextual.

Lindsey and BMA disagree over which legal standard governs this analysis. They dispute whether the district court was right to apply a "but-for" causation standard, which would require Lindsey to demonstrate that *both* of BMA's asserted reasons were pretextual, *Machinchick v PB Power, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)—or whether the district court should have applied a "mixed-motive" framework, which would require her to demonstrate only that *one* of BMA's reasons was pretextual, *Richardson*, 434 F.3d at 333.

In our circuit, "it is unclear whether a mixed-motive causation standard is ever proper for FMLA retaliation claims." *Adams v. Mem'l Hermann*, 973 F.3d 343, 353 (5th Cir. 2020). We have recognized that two Supreme Court cases suggest it might not be. *Id.* at 352 (citing *Gross*, 557 U.S. at 129, and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

*See also Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389–90 & n.11 (5th Cir. 2013) (noting that *Gross* and *Nassar* "limited the applicability of the mixed-motive framework" in other employment discrimination statutes but leaving the question of their effect on FMLA claims "for another day").

But we ultimately need not resolve this question here, because we find that there is a genuine issue of material fact as to whether both of BMA's asserted reasons for Lindsey's termination were in fact pretextual. The parties agreed during oral argument that the court need not determine which framework applies in the event we find both of BMA's proffered reasons to be pretextual.

To begin with, we agree with the district court that Lindsey produced enough evidence for a factfinder to conclude that BMA's attendance-based justification was pretextual. A justification is pretextual when it is "unworthy of credence"—i.e., when it "is not the real reason for the adverse employment action." *Watkins v. Tregre*, 997 F.3d 275, 284 (5th Cir. 2021) (quotation omitted). "[A]ny evidence" that casts doubt on BMA's assertion is in play, and a fact dispute exists so long as Lindsey's evidence "is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 283–84 (emphasis omitted) (quotations omitted).

Several pieces of evidence suggest that Lindsey's purported attendance problems were not the "real reason" for her termination. First, "Lindsey received her first ever disciplinary action" in more than 17 years of working for BMA "within three weeks of returning from FMLA leave." Second, Lindsey's initial Corrective Action Form failed to list a single date that she was absent, even though the form had a portion labeled "Date(s) of incident/occurrence." Third, David Powe, the supervisor who prepared Lindsey's Corrective Action Form, testified that he could not identify the

days or hours that Lindsey did not show up to work.  Fourth, Lindsey's second Corrective Action Form listed only three incidents—one of which took place during a time period when Powe testified that Lindsey's attendance was improving, and another of which occurred while she was sick.  Finally, Lindsey's termination form listed a single date that management was unable to reach her, which Lindsey testified was because she was away at a training meeting.  As the district court correctly concluded, this record evidence creates a fact issue as to whether BMA's attendance rationale is "unworthy of credence" and whether BMA discriminated against Lindsey as a result.  BMA does not contend otherwise.

Turning to BMA's assertion that Lindsey was fired because she failed to complete the catheter reports on time, there is some evidence that Lindsey's late reports may have contributed to BMA's decision.  The company's termination form expressly mentions the reports.  And Powe testified that he started considering Lindsey's termination around July 13— the day after Network 13's Quality Improvement Director contacted BMA's Vice President of Quality about Lindsey's late report.

But there is also evidence indicating that BMA wouldn't have fired Lindsey for the missed deadlines alone.  Before concluding that "Leisha Lindsey's employment is terminated," her termination form notes that Lindsey "has not [met] expectations outlined in previous warnings as to being present at the facility during normal work hours."  Likewise, her first Corrective Action Form stated that "[f]ailure to meet [attendance-based] expectations will result in further corrective action, up to and including termination of employment."  Additionally, Powe later testified that the "main point" of his complaint was that Lindsey "was not coming to work."  But as we and the district court have concluded, there is a fact dispute as to whether BMA's attendance rationale is pretextual.

What's more, BMA did not follow its own progressive discipline policy, which instructs that "corrective action be escalating." BMA took no corrective action against Lindsey whatsoever for failing for several months to submit the tracking reports on time—it simply terminated her on August 1. As Lindsey states in her brief, "the fact that [BMA] did not issue a counseling statement on the alleged tardy reports is quite telling" in light of the fact that her supervisors "had not missed any opportunity to issue counseling statements and job performance deficiency statements to [her] relating to alleged absenteeism." Finally, Lindsey's deposition testimony suggests that BMA did not view her untimely reports as a serious infraction. As she explained, the late reports "never [caused] an issue"—"[i]f you were late, then you'd call Ms. Lynda [Ball, Network 13's Quality Improvement Director], you'd tell her, and she says 'Thank you.'"

As anyone who has ever worked in an office environment can attest, there are real deadlines and hortatory ones—and everyone understands the difference between the two. Missing real deadlines results in actual adverse consequences for employer and employee alike—while failing to meet hortatory deadlines does not. BMA does not point to any adverse impact that Lindsey's tardy reports had on the company. And in any event, there is no evidence BMA ever warned Lindsey that failure to submit the reports on time could jeopardize her job. So there is a genuine issue of material fact as to whether BMA's assertion that it fired Lindsey for this reason is "unworthy of credence."

Accordingly, we reverse the entry of summary judgment on Lindsey's FMLA retaliation claim and remand for further proceedings on that claim.

## C.

Lastly, Lindsey alleges that BMA retaliated against her for objecting to Robinson's prescription proposal, in violation of Louisiana's

whistleblower law. LA. REV. STAT. 23:967A(3). That statute provides, in relevant part, that "[a]n employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law[,] . . . [o]bjects to or refuses to participate in an employment act or practice that is in violation of law."

The district court rejected Lindsey's state law retaliation claim after determining that the lone provision she cited as a "violation of law" didn't actually prohibit Robinson's prescription proposal. Lindsey challenges that determination on appeal and cites several provisions in support.

We need not delve into the intricacies of Louisiana pharmacy law, however, because we can affirm summary judgment on a different ground. *See United States v. Mazkouri*, 945 F.3d 293, 307 (5th Cir. 2019) ("[W]e can affirm on any ground supported by the record."). The Louisiana Supreme Court has held that, "[i]n order to bring an action under [Louisiana Revised Statute] 23:967, the employee must establish the employer engaged in workplace conduct constituting an *actual violation* of state law." *Encalarde v. New Orleans Ctr. for Creative Arts/Riverfront*, 2014-2430 (La. 2/13/15); 158 So.3d 826, 826 (mem.) (emphasis added); *accord Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 187 (5th Cir. 2018). And as BMA correctly explains, "Lindsey cannot establish that a violation of state law regarding patient medication ever occurred, or that it was ever an actual practice of BMA."

Indeed, Lindsey practically concedes as much. Her opening brief repeatedly states that she objected to a "proposed practice," not to an actual one. Her reply brief does not respond to BMA's argument. And she testified at her deposition that she "d[idn't] have any evidence that [prescription redistribution] was actually going on" at her clinic.

No. 20-30289

We agree with the entry of summary judgment on Lindsey's Louisiana whistleblower claim.

\* \* \*

For the foregoing reasons, we affirm in part and reverse in part and remand for further proceedings on Lindsey's FMLA retaliation claim.